**FARMLAND INDUSTRIES, INC.,**
**Plaintiff,**

v.

**KANSAS–NEBRASKA NATURAL GAS**
**COMPANY, INC., Defendant.**

**No. CV71–L–300.**

United States District Court,
District of Nebraska.

Oct. 17, 1972.

672

Leonard O. Thomas, Kansas City, Kan., and Flavel A. Wright, Lincoln, Neb., for plaintiff.

Richard Jones, Wichita, Kan., James D. Conway, Robert A. Miller, Jr. and J. Robert Wilson, Hastings, Neb., for defendant.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

Compensatory and injunctive relief are sought by an industrial user of natural gas from a natural gas company for an alleged abandonment of service in violation of 15 U.S.C. § 717f(b), a provision of the Natural Gas Act. A claim for punitive damages was withdrawn during trial. Trial has been completed and briefs of eminent quality have been provided by counsel of both parties.

Jurisdiction is conferred upon this court by 15 U.S.C. § 717u. A memorandum of this court, filing No. 11, deals more extensively with the disputed issue of whether the court has jurisdiction over the person of the defendant and the subject matter of the action, concluding that it does.

### THE FACTS

The plaintiff was originally incorporated under the laws of Kansas as "Consumers Cooperative Association." This name was changed to Farmland Industries, Inc. and the corporation is duly authorized to do business in Kansas and Nebraska.

The plaintiff, during and before the year 1960, considered the purchase of land and the erection of a facility within the State of Nebraska for the purpose of producing anhydrous ammonia, a fertilizer widely used by farmers and others engaged in agricultural pursuits. The raw materials for anhydrous ammonia are water, air, and natural gas.

Air, and in most places water, are readily available, but such a facility must be constructed in a place where natural gas is available in large volume for two purposes. First, the manufacturing plant producing anhydrous ammonia must have as the raw product a continuous and steady flow of natural gas. Second, a plant such as that subsequently erected by the plaintiff near Hastings, Nebraska, requires gas to be used for creating steam and high temperature as a part of the manufacturing process, as well as for ordinary space heater use.

The defendant, incorporated under the laws of Kansas, is authorized to do business in Nebraska and has been and is engaged in the transporting of natural gas in interstate commerce. The defendant, a public utility, is and has been, since the plaintiff's facility at Hastings, Nebraska, was begun, the sole natural gas pipeline supplier from which the plaintiff could obtain pipeline natural gas at its Hastings plant.

The defendant is now and has been at all times material to this action subject to the provisions of the Natural Gas Act with regard to its transportation in interstate commerce of natural gas. The transportation of all natural gas sold to plaintiff for its Hastings, Nebraska, facility has been subject to the provisions of the Natural Gas Act.

Prior to the location of a plant near Hastings, Nebraska, for the purpose of producing anhydrous ammonia, the plaintiff consulted with the president and other officials of the defendant with regard to the supply of natural gas and made other surveys concerning costs as well as the market for anhydrous ammonia. Following the plaintiff's investigation, it began construction in July of 1961 and it expended approximately $7,693,000 in building an anhydrous ammonia plant near Hastings, Nebraska; in 1963 the plant was expanded at an additional cost of approximately $6,393,000. The plant, as enlarged, went into operation in 1963 and has since been at all times, except during routine maintenance shutdowns, in continuous operation in the production of anhydrous ammonia.

In this proceeding, the term "firm gas" refers to the natural gas which is used as the raw product; the term "process gas" is synonymous with firm gas. Firm gas must be furnished without interruption in order for the plant to operate. In this proceeding, the term "interruptible gas," also sometimes referred to as "boiler gas," refers to gas

furnished for the purpose of providing heat, both in the creation of the high temperature necessary to produce anhydrous ammonia and for ordinary heating purposes. This boiler gas is provided upon an interruptible basis. An alternate fuel is used when natural gas is not available. The plaintiff utilizes fuel oil as its alternate fuel at its plant.

Pursuant to the provisions of the Natural Gas Act, and before the plaintiff actually began the construction of its facility near Hastings, Nebraska, the defendant made an application to the Federal Power Commission for a certificate of convenience and necessity authorizing the defendant to construct facilities necessary to deliver gas and to deliver to the plaintiff the gas, both firm and interruptible, necessary for operation of the plaintiff's facility as originally contemplated. (Docket No. CP61–142) Such certificate was issued. However, because the plaintiff desired to enlarge its facilities, it was necessary to file a second application for a certificate of public convenience and necessity. The defendant made application to the Federal Power Commission for such second certificate of convenience and necessity (Docket No. CP63–28), which certificate was issued on December 10, 1962, and which has been received in evidence as Exhibit 1. Amended in 1963 in details not material to this action, the certificate remains in full force and effect. No application to alter or amend has been filed. By the certificate the defendant is authorized to transport and deliver to the plaintiff a maximum of 10,000 MCF per day of firm gas and a maximum of 8,000 MCF per day of interruptible gas.

The plaintiff, before beginning the construction of its facility, entered into a contract dated October 25, 1960, to purchase firm gas from the defendant, subject to the defendant's obtaining, before beginning construction, of a requisite certificate of convenience and necessity from the Federal Power Commission. Thereafter, because of the enlargement of the facility, the parties cancelled this contract effective December 31, 1962, and entered into a new contract effective January 1, 1963, received in evidence as Exhibit 5. Rates provided in Exhibit 5 remained in effect without attempt to modify until the defendant mailed and the plaintiff received a letter dated November 23, 1970, Exhibit 6, by which the defendant in accordance with the contract, Exhibit 5, requested a conference with the plaintiff to discuss an increase of rates. With the letter was tendered a proposed contract whereby the rates in Exhibit 5 would have been increased.

Negotiations ensued but the parties were not able to agree upon a rate for gas to be used as raw material. On February 16, 1971, the defendant mailed and the plaintiff subsequently received a letter, Exhibit 8, which accompanied a notification of cancellation of the contract, Exhibit 5, effective at midnight, April 30, 1971.

On April 23, 1971, the defendant, by application to the district judge for Adams County, Nebraska, obtained a temporary injunction, to become effective May 1, 1971, whereby the plaintiff herein, Farmland, was enjoined "from interfering with the cancellation of the contract dated January 1, 1963," and from "taking raw material gas from [Kansas-Nebraska] subsequent to April 30, 1971, except at the rate of 10.3¢ per MCF demand charge and 30.1¢ per MCF commodity charge until further order of this court," upon the filing of a surety bond in the amount of $25,000. On the same day, Farmland, by application to the district judge for Pawnee County, Kansas, obtained a temporary restraining order, restraining Kansas-Nebraska "from discontinuing service to [Farmland Industries, Inc.] at its Hastings, Nebraska, plant and . . . from decreasing below the level of the [Farmland Industries, Inc.'s] normal use . . . natural gas . . . at the . . . Hastings plant," effective upon the posting of a $100,000 bond. Neither the injunction nor restraining order has been modified or set aside.

Farmland unsuccessfully moved to set aside the injunction.

On January 1, 1963, the parties entered into a contract for interruptible industrial service (boiler gas), which contract was terminated by the defendant effective December 31, 1970. On January 2, 1971, at 7:00 p. m., following the termination of the contract, gas deliveries of boiler gas were interrupted on account of a shortage of supply due to usage created by weather conditions, such shortage, due to such circumstances, being such as authorized the defendant, Kansas-Nebraska, to curtail service under the interruptible industrial service contract. In accordance with such curtailment, the plaintiff began on January 3, 1971, using fuel oil as a substitute for boiler gas. Service of interruptible or boiler gas could have been restored under the weather conditions existing on January 8, 1971, but was not restored because the parties had not reached agreement regarding price, and Kansas-Nebraska refused to restore service of gas until agreement had been reached as to price and a contract reflecting that price executed. Negotiations continued. On January 11, 1971, Farmland filed a declaratory judgment action in the District Court of Adams County, Nebraska, asking that Kansas-Nebraska be required to abide by the terms of the interruptible industrial service contract of 1963 and requesting a temporary injunction to restrain Kansas-Nebraska from refusing to deliver boiler gas in accordance with that contract. Subsequently, the District Court of Adams County, Nebraska, refused to issue a restraining order or injunction and held that the 1963 contract for boiler gas had properly been cancelled as of December 31, 1970. That ruling has become final. Service of boiler gas was resumed by Kansas-Nebraska to Farmland sometime on January 23, 1971, the parties having that day or the day before signed a contract, Exhibit 11, increasing the rates for boiler gas, but accompanied by a letter from Farmland's president reserving Farmland's right "to test the reasonableness and/or legality of such rates in any proceedings, judicial or otherwise, as may be available . . . ." and declaring that Farmland was executing the contract "under economic duress." (Exhibit 12)

Weather conditions were such that, if service had been restored on January 8, it would have reasonable been interrupted during all January 11, 12, 13, 18 and 19, 1971, and switchovers from gas to fuel oil to accommodate those interruptions would have been necessary and use of fuel oil for those dates would have been necessary.

## OCCURRENCE OF ABANDONMENT

A. *Boiler (interruptible) gas.*

"No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, *or any service* rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permits such abandonment." (Emphasis added)

15 U.S.C. § 717f(b)

There is no question that Kansas-Nebraska is a "natural-gas company" within the meaning of the Act. Panhandle Eastern Pipe Line Company v. Michigan Public Service Commission, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951). The facilities used to deliver gas under the contract with Farmland were facilities certificated by the Federal Power Commission; they are facilities subject to Commission jurisdiction. United Gas Pipeline v. Federal Power Commission, 385 U.S. 83, 87 S.Ct. 265. 17 L.Ed.2d 181 (1966). Thus, Kansas-Nebraska was required by § 717f(b) to apply to the Commission for permission to abandon the service rendered to Farmland. The narrow question is whether

the failure to resume service of boiler gas, which service previously had been properly interrupted because of atmospheric conditions, constitutes an abandonment.

■ Abandonment is not restricted to a physical alteration of facilities. It may include a cessation of services rendered by facilities subject to Commission jurisdiction. United Gas Pipeline v. Federal Power Commission, supra. A substantial reduction in the amount of gas supplied through the jurisdictional facilities has been held to constitute an abandonment. Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 177 F.2d 942 (C.A. 6th Cir. 1949).

Particularly instructive language is in Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 153–155, 80 S.Ct. 1392, 1402, 4 L.Ed.2d 1623 (1961):

". . . [T]he Power Commission has from an early date taken the view that there is a continuing obligation to perform 'service' imposed by the Act which outlasts the term of a seller's original contract of sale. As early as 1942 it held that an abandonment of service after the expiry of such a contract had to have Commission approval under § 7(b). United Gas Pipeline Co., 3 F.P.C. 3, 9. This ruling was made by Commissioners who had been in office during the passage of the Act. It was not a fundamental ruling on a broad question of jurisdiction as to which a court might enjoy a wider latitude of review. . . . It was rather an early implementation and application of a detail of the statutory scheme by the Commission in a regulatory setting before it. The ruling has been followed, see Panhandle Eastern Pipe Line Co., 11 F.P.C. 167, 172, and we think this contemporaneous and consistent construction, pointing again to a distinction between the underlying 'service' to the public and the contractual means by which it is implemented, is to be afforded weight in the construction we make.

* * * * * *

"It is apparent that the Commission's order in no way violates the integrity of petitioner's contract with United. During its term, both parties are bound by it to the same extent as any members of this regulated industry. When it expires, petitioner, to be sure, will be under an obligation to continue to deliver gas to United on the latter's request unless it can justify an abandonment before the Commission; but we do not see how this in any way disturbs the integrity of the contract during its term. The obligation that petitioner will be under after the contract term will not be one imposed by contract but by the Act. It will be free then, as it was not free during the contract term under the contract here in question, to make rate changes under § 4 without United's consent. . . ."

It thus appears that *Sunray* approves the position of the Commission that a cessation of service at the expiration of a contract term is an abandonment. See, also, Re Shell Oil Company, 39 PUR3d 312 (1961).

■■ Kansas-Nebraska urges that it was justified, if not legally compelled, to refuse to restore service when it had no contract for service with Farmland. It argues that to have resumed service without a contract would have placed it in violation of its certificate of convenience and necessity and of 15 U.S.C. § 717c(b), which states:

"No natural-gas company shall . . . (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service."

Kansas-Nebraska's position evidently is that, because other customers had signed contracts at higher rates than had obtained before December 31, 1970,

Kansas-Nebraska's furnishing boiler gas to Farmland without a contract or at an undetermined price or at a price the same as was extant before December 31, 1970, when the old contract ended, would constitute an "undue preference or advantage" to Farmland or an "unreasonable difference in rates."

The argument's weakness is its misdirection. If an argument of justification of abandonment had been made to the Federal Power Commission as anticipated by § 717f(b), it may well have been persuasive. But the argument to this court of justification of abandonment does not justify the failure to ask the Federal Power Commission's approval of a proposed abandonment. The Natural Gas Act bluntly forecloses any abandonment, whether justified or not, without prior approval by the Federal Power Commission. Nonrenewal of boiler gas service on January 8, 1971, was an abandonment of service by Kansas-Nebraska within the meaning of § 717f(b).

This conclusion is reached without reference to Kansas-Nebraska's position that Farmland, as a direct industrial user, is not within the protection of the Natural Gas Act. The factual determination of whether an abandonment occurred must be made without reference to the legal consequences of such an abandonment. Discussion of the effect of the abandonment will be reserved for a later point in this memorandum.

B. *Process (firm) gas.*

■ The claim of abandonment of service of process gas stands on a different factual footing from that of boiler gas. No interruption of process gas service ever occurred. Nevertheless, Farmland urges that there was a threat of abandonment of process gas service. Against the experience of Kansas-Nebraska's actions in January, 1971, relating to fuel gas, Farmland reasonably was apprehensive in April of that year that service of process gas would be suspended at the termination of the contract for process gas on April 30, 1971. It accordingly sought and obtained a state court order, restraining Kansas-Nebraska from discontinuing service or decreasing service below the level of Farmland's normal use of natural gas. On the same day Kansas-Nebraska received an order from a different state court, enjoining Farmland from taking process gas from Kansas-Nebraska after April 30, 1971, except at specified, increased rates until further order of the court. That act by Kansas-Nebraska, Kansas-Nebraska's awareness that no substitute fuel could be used by Farmland as a raw material for production of anhydrous ammonia, and direct testimony at the trial of Kansas-Nebraska's intentions, are persuasive that an abandonment of process gas service was not contemplated or threatened by Kansas-Nebraska, and I so find. In view of this finding, it is not necessary to decide whether the Natural Gas Act forbids a threat of abandonment.

No abandonment or threat of abandonment having occurred as to process gas, no further consideration will be given to the process gas aspects of the case, except for consideration of specific relief requested which will be discussed later in the memorandum.

## PRIVATE REMEDY UNDER NATURAL GAS ACT

In view of the finding that the actions of the defendant with respect to cessation of service of boiler gas amounted to an abandonment without prior Commission approval, in violation of § 717f(b), it is next necessary to determine the legal consequences, if any, of that act. The question is whether a private right of action for the recovery of damages for the abandonment of service to certificated facilities through which natural gas is supplied to a direct industrial consumer is implied in the Natural Gas Act. At the risk of oversimplification, it may be said that the plaintiff's position is that the defendant, in abandoning service, breached a duty owed to the plaintiff by virtue of the Natural Gas Act and that the breach made the defendant liable for all damages flowing

from that act, including the difference between a reasonable rate for gas and the rate called for by the contract which the plaintiff allegedly signed only under the duress created by the abandonment and the threat of continued interruption of service. The plaintiff refers to a number of cases which have found private rights of action for damages in violations of analogous regulatory statutes. No case has been found which has declared, or refused to declare, that a similar right of action was created by the Natural Gas Act.

The defendant's position is that Farmland, as a direct industrial consumer, is not within the class of consumers sought to be protected by the Act, and, not being protected by the Act, Farmland cannot enforce the provisions of the Act. It further urges that this court has no jurisdiction, especially for the purpose of determining the reasonableness of rates charged.

The general jurisdictional portion of the Natural Gas Act, 15 U.S.C. § 717u, vested the United States district courts with "exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder . . ." This jurisdictional section is very similar in wording to other jurisdictional provisions within federal regulatory legislation. In the case of J. I. Case Co. v. Borak, 377 U.S.

426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court of the United States determined that § 27 of the Securities Act created a private right of action for violations of § 14(a), noting that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" of the Act. 377 U.S. at 433, 84 S.Ct. at 1560. To similar effect are Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (§ 10(b), Securities Act); Bivens v Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Fourth Amendment); Allen v State Board of Elections, 393 U.S. 544, 557, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (§ 5, Voting Rights Act of 1965); Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967) (§ 16 of Rivers and Harbors Act of 1899); Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957) (§ 301(a), National Labor Relations Act); Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944) (Railway Labor Act); and Texas & Pacific Railway Company v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916) (§ 2, Safety Appliance Act). See, also, Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968) (Black, J., dissenting).

Similar questions have often arisen in various United States courts of appeals and district courts.[1] It is enough to say

---

1. The bellweather case among the decisions from the circuit courts is Reitmeister v. Reitmeister, 162 F.2d 691 (C.A. 2nd Cir. 1947). In that case, Judge Learned Hand found that a civil action for damages could be maintained for a violation of the Communications Act of 1934.

The doctrine underwent little development prior to the interposition of the decision of the Supreme Court in the *Borak* case. Since that time, however, the question has been raised with increasing frequency and with varying results. Rights of action have been found,

for example, in a violation of § 44 of the Investment Company Act, 15 U.S.C. § 80a-43. Moses v. Burgin, 445 F.2d 369 (C.A. 1st Cir. 1971). See, also, Herpich v. Wallace, 430 F.2d 792 (C.A. 5th Cir. 1970). Likewise, actions have been maintained seeking civil liability under § 2 of the National Railway Labor Act, Burke v. Compania Mexicana De Aviacion, S.A., 433 F.2d 1031 (C.A. 9th Cir. 1970); § 7 of the Securities Act of 1934, Pearlstein v. Scudder & German, 429 F.2d 1136 (C.A. 2nd Cir. 1970); the Wagner-Peyser Act of 1933, Gomez v. Florida State Employment Service, 417 F.2d

that the authorities are divided on the questions of inferring private rights of action, although not irreconcilably.

 From the rationale distinguishing those cases which have inferred a private civil remedy from those which have not in analogous contexts, five factors emerge. Before a specific private remedy, either equitable or legal, may be found in a congressional Act not expressly granting one, it must appear that (1) the plaintiff is within a class intended to be protected by the Act, (2) private enforcement will further the congressional policy of the Act, (3) the duty breached was created by the Act, rather than by state statutory or common law, (4) the violation of the duty affected the plaintiff directly, and (5) no other remedy is available to guard adequately the right asserted. Equitable remedies may be inferred more readily than damage remedies, and no remedy will go further than necessary to achieve protection of the asserted right.

Supportive of the defendant's position that the plaintiff, as a direct industrial user, is not one who was intended to be protected by the Act is congressional history that regulation of *rates* was to be left to states. In the Senate statement of the general purposes of the bill is language to the effect that the limit of federal rate regulation was

"to determine the fairness of rates charged by interstate pipe-line companies for natural gas sold to distributing companies for resale to domestic customers."

Congressional Record—Senate, 1937 at p. 2489.

The plaintiff is not a distributing company receiving natural gas for resale.

In the hearings before the House Committee on Interstate and Foreign Commerce, Seventy-fifth Congress, first session (hereafter called hearings), numerous references were made to direct industrial users.[2] Collectively, the ref-

---

569. 576 (C.A. 5th Cir. 1969) ; 49 U.S.C. § 484(b) ; Fitzgerald v. Pan American World Airways, 229 F.2d 499 (C.A. 2nd Cir. 1956).

At the district court level, civil remedies were implied for violations of §§ 608 and 609 of the Corrupt Practices Act in Common Cause v. Democratic National Committee, 333 F.Supp. 803 (U.S.D.C., D.C.1971), and § 15(a)(3) of the Fair Labor Standards Act in Fagot v. Flintkote Company, 305 F.Supp. 407 (U.S.D.C., E.D.La.1969).

Conversely, civil actions have been denied when founded on violations of federal regulatory and criminal statutes in a number of cases. See, e. g., Connecticut Action Now, Inc. v. Roberts Plating Co., 457 F.2d 81 (C.A. 2nd Cir. 1972) (Rivers and Harbors Act of 1899) ; Chavez v. Freshpict Foods, Inc., 456 F.2d 890 (C.A. 10th Cir. 1972) (Immigration and Nationality Act) ; B. F. Goodrich Company v. Northwest Industries, Inc., 424 F.2d 1349 (C.A. 3rd Cir. 1970) (§ 5, Interstate Commerce Act) ; McCord v. Dixie Aviation Corporation, 450 F.2d 1129 (C.A. 10th Cir. 1971) (Federal Aviation Program of 1958) ; Royal Services, Inc. v. Maintenance, Inc., 361 F.2d 86 (C.A. 5th Cir. 1966) (Small Business Act) ; Blaney v. Florida National Bank

at Orlando, 357 F.2d 27 (C.A. 5th Cir. 1966) (Federal Reserve Act). See, also, Holloway v. Bristol-Myers Corporation, 327 F.Supp. 17 (U.S.D.C., D.C.1971) (Federal Trade Commission Act) ; Tanner v. Armco Steel Corporation, 340 F. Supp. 532 (U.S.D.C., S.D.Tex.1972) (National Environmental Policy Act of 1969).

2. The following are illustrative statements. Harry Gandy, Jr., representing the National Coal Association, objected to the lack of control over industrial consumers:

"I desire to make it clear, beyond any chance of misunderstanding, that the statement is not a commitment either of approval or of opposition to the proposed legislation, it merely being for the purpose of pointing out to your committee certain defects which we feel the bill contains, chief among which is the exemption of the sale of natural gas for industrial use only. We have pointed out that with the exemptions that are seemingly provided for in the bill itself, the bill leaves scarcely anything to control. There is no need to go into those exemptions, because they are all explained entirely in the statement."

Hearings at p. 121

erences evidenced awareness of excluding federal determinations of rates but uncertainty as to exclusion of all other forms of regulation for direct industrial users and an intent to regulate where, but only where, the states could not regulate. Rates with respect to direct industrial users could be regulated by the states.

■ The breadth of the language in the Act, prohibiting abandonment without prior approval (§ 717f(b)) and undue preference and unreasonable difference in rates (§ 717c(b)), militates toward a finding that Congress intended direct industrial users to be beneficiaries of those two provisions. Whereas other provisions carefully exclude direct industrial users, those two do not. The defendant appears to acknowledge that it could not give a direct industrial user an undue preference nor could it give other users an undue preference over a direct industrial user. From the congressional history and the wording of the Act, this court concludes that although the plaintiff is not within the class of persons intended to be protected by any rate-setting provisions of the Act, it is within the class of persons intended to be protected by the abandonment provision.

Next, it must be determined whether the congressional policy would be furthered by an inference of a private right of action as a consequence of abandonment. In the case of Re Shell Oil Company, 39 PUR 3d 312 (1961), the Federal Power Commission indicated that a technical abandonment which had no effect on the gas-consuming public was of no consequence. Although the plaintiff argues that the Farmland plant is important to the economy of the area, this, I think, is inadequate to show detriment to the public who consumes natural gas at retail. However, I am not persuaded that such harm needs to be shown. In the course of the hearings on the Natural Gas Act, an amendment was offered and rejected which would have allowed facilities to be abandoned without prior Commission approval "if service is not thereby impaired or if substitute facilities will be installed." Hearings, p. 124. A substitute amendment to the effect that substitution of facilities was not to be deemed an abandonment was accepted. In commenting on this amendment, the committee indicated that:

". . . The important thing is that service shall not be abandoned without approval of the commission having jurisdiction, and the proposed amendment protects the consumer and the public in this regard, leaving the companies free to conduct such details of their business as do not interfere with service."

Hearings, p. 148.

■ The proscription of abandonment without prior Commission approval was designed to ensure stability and continuity of service. That purpose can be afforded assurance by interposition of a private right of action by offended users of gas, at least for injunctive relief and, perhaps, for compensatory damages. An additional goal of the Act un-

Mr. W. A. Dougherty in his testimony offered an amendment which would have excluded specifically from Commission rate regulation gas purchased for resale to industrial users. Noting that the bill as then drawn did exclude gas sold for industrial use, Mr. Dougherty indicated some confusion as to the scope of the exclusion:

"There is a question in the minds of some of the people in the industry as to whether or not the language as it is now in lines 12 and 13 applies only to the sale of gas that is made by the pipe line directly to the industry and does not include in the exclusions the gas that the pipe line sells to a distributing company for resale for industrial purposes, and the purpose of the addition of these words is to make clear that all gas that ultimately goes to industrial customers, purchased under the separate rate or a separate contract, for that purpose is not within the provisions of his [sic] legislation.

Hearings at p. 125

doubtedly is to accomplish a presentation at a hearing before the Federal Power Commission of competing interests for arriving at a decision as to whether an abandonment would be in the public interest. Farmland has been denied the occasion for presenting its side of that matter. Injunctive relief at a proper time would be useful in that regard, but relief by assessment of damages would be of lesser value.

■ As to factor (3), it is true that the duty not to abandon without prior approval is created by the Act itself. The duty to furnish natural gas *at reasonable rates* to the plaintiff, however, is created by state common law, not by the federal statute.

As to factor (4), the violation by the defendant of the duty not to abandon without prior approval did affect the plaintiff directly, at least to the extent that additional expense was incurred in purchasing fuel oil for operation of the boilers during the period of abandonment. Direct impact of the abandonment on the rates paid after the abandonment is less certain. In any event, other forums exist for the issue of reasonableness of rates.

■ Where other remedies exist, federal courts are loathe to declare the creation of a new one by inference. Presently, actions are pending in state courts between the plaintiff and the defendant here. There is nothing to suggest that those actions, or some different action in a state court, would be inadequate to determine the reasonableness of the rates Kansas-Nebraska has charged Farmland since the termination of the former contract for boiler gas. As new federal remedies should be no broader than necessary, one should not be extended to take from the state courts the prerogative of deciding the rate issue. The wrong, if there be one, will not go remediless if no federal claim is inferred. Cf. Allen v. State Board of Elections, 393 U.S. 544, 556, n. 2, 89 S. Ct. 817, 22 L.Ed.2d 1 (1969).

■ Equitable relief is and has been available to Farmland. Indeed, if injunctive relief had been sought promptly in a federal court to intercept the abandonment, most of the damage from increased expenses probably could have been avoided. To be sure, the dispute over rates would have persisted, but that does not necessitate the resolving of the issue by a federal court.

■ Awarding of damages for loss (not an increase in rates) arising from the unauthorized abandonment cannot be made, apparently, in any forum except the federal court. Neither the state court nor the Federal Power Commission is empowered to perform that task, in view of the Act's declaring that exclusive jurisdiction resides in the federal courts. Such relief is therefore proper in this action.

A need of preventing future abandonments has not been established in this case. Nothing suggests a likelihood of recurrences of past behavior or the probability of irreparable future harm.

For the foregoing reasons I conclude that this court does not have jurisdiction to determine the reasonableness of natural gas rates. Because a specific motion to that effect was made by the defendant (filing No. 32), that motion is to be granted.

## RELIEF
### Count I

Count I of the complaint alleges that the District Court of Adams County, Nebraska, at the request of Kansas-Nebraska, improperly issued an injunction and that "[b]ecause of the fact that the temporary injunction . . . was issued and served . . . this plaintiff has, for service since the 1st day of May, 1971, to and including July 31, 1971, paid $71,430.00, and will be required to pay proportionate amounts each and every month the said order remains in effect, in excess of a reasonable rate for gas received . . ." The gas referred to is the process gas,

used as a raw material for anhydrous ammonia.

The injunction was issued April 23, 1971. It enjoined Farmland from "interfering with the cancellation of the contract dated January 1, 1963," and from "taking raw material gas from [Kansas-Nebraska] subsequent to April 30, 1971," except at rates specified. A surety bond was required and was posted by Kansas-Nebraska. Farmland asks that that injunction be voided by this court, that Kansas-Nebraska be directed to serve gas to Farmland until abandonment has been approved by the Federal Power Commission, and that this court enter judgment for the amount paid in excessive rates.

 This state court injunction does not, as contended by Farmland, authorize an abandonment without prior approval of the Federal Power Commission. The state court had jurisdiction to decide the issues of termination of the contract and reasonableness of the gas rates. The injunction dealt with no other matters. There is no basis for my interfering with the state court action. Furthermore, as discussed in prior portions of this memorandum, no abandonment or threat of abandonment has occurred with respect to process gas.

The relief requested in Count I will be denied.

*Count II*

In Count II of the complaint the plaintiff seeks compensatory damages for the abandonment of boiler gas service. In open court during the trial the plaintiff withdrew its claim for punitive damages. Because I now have decided that the plaintiff is entitled to damages in this court arising directly from the abandonment, but not any amount claimed to have been paid in excess of a reasonable rate, the recover will be limited.

The plaintiff has computed in Exhibit 63 damages based upon four factors:

1. The cost of the commodity fuel oil as compared to the cost of boiler gas;

2. The loss of production of anhydrous ammonia attributable to fuel oil use;

3. Depreciation of equipment due to the use of fuel oil; and

4. Incidental costs related to the use of fuel oil.

Amounts claimed for equipment depreciation should be eliminated. Although there was evidence to indicate that long-term use of fuel oil shortens the useful life of equipment, I am not persuaded that the short-time use of fuel oil necessitated by the abandonment decreased the useful life. The plaintiff has assumed that because depreciation would occur from a long-term use of fuel oil, which was insufficiently defined, several days of use would cause depreciation at a linear rate. The plaintiff has not met its burden of proof in that respect.

I have also not included in the computation of damages any amounts attributable to the costs of converting to fuel oil use. Such conversion would have been necessary in the absence of an abandonment, and thus any amounts expended for the conversion are not a consequence of the abandonment.

Service could properly have been restored sometime on the 8th of January, 1971. It was actually restored sometime on the 23rd of January, 1971. During that time period, service could properly have been interrupted, because of the atmospheric conditions, on the 11th, 12th, 13th, 18th and 19th of January, and those days should be eliminated from computations of damages. It is uncertain what time of day service could have been restored on the 8th. It appears from Exhibit 63 that service could have been restored early on the 8th and was actually restored early on the 23rd. By including the 8th and excluding the 23rd, it appears that the most nearly accurate approximation of actual damages can be reached.

 The first item of damages sought is the difference in cost between fuel oil and natural gas fuel. Evidence indicated that it takes 18 MCF of boiler

gas to produce one ton of anhydrous ammonia. The plaintiff used an expected production of 476.34 tons of ammonia per day using natural gas as fuel. Accepting the plaintiff's production figure as correct, the plaintiff would have used 8,584.12 MCF of boiler gas for each day.[3] At the new contract rate of 36.71¢ per MCF, boiler gas costs would have been $3,327.19 per day.[4] By deducting this figure from the cost of fuel oil on each day during which natural gas service was improperly interrupted, the figure of $23,951.72 is reached as the actual amount by which fuel oil costs exceeded the boiler gas costs which would have been incurred on each of the days.

The plaintiff has adequately shown that production was impaired when fuel oil was used. I therefore include damages for lost profits due to decreased production. As I have used the plaintiff's figure of 476.34 tons of ammonia production per day, I again rely on that figure to compute the second item of damages. Deducting the actual amount of production from the amount which would have been produced and multiplying by $27.52 (selling price per ton, less production cost) results in a figure of $8,610.68.

The plaintiff has included a computation of additional miscellaneous costs attributable to using fuel oil. For example, it is necessary to use steam to atomize the fuel oil. Thus, the cost of producing the steam may be included as a cost of burning fuel oil. Also included are such costs as electricity for pumping and warming the oil. I accept the plaintiff's figure of $.002443 per gallon of fuel oil. Multiplying this by the total of 516,942 gallons of fuel oil used on those days when service was improperly interrupted produces the amount of $1,262.89 in incidental damage.

The total of these amounts is $33,824.-29, the total damages which I find attributable to the defendant's wrongful act of abandoning service to the plaintiff.

*Count III*

Count III of the complaint asks generally that the court "adjudicate the rights and liabilities of the parties in accordance with the terms of the Natural Gas Act and the provisions of the United States Constitution, for such other relief as to the Court may seem just or equitable, and for its costs and disbursements herein incurred."

▮ This request, in light of what hereinbefore has been said, requires no additional relief, except a declaration that Kansas-Nebraska is obligated to furnish natural gas, both boiler and process, to Farmland in amounts required for normal use by Farmland, not exceeding the maximums authorized by

---

3. This indicates that the amount of boiler gas needed to produce the anhydrous ammonia that reasonably could have been produced with boiler gas during the period of interruption would exceed the maximum amount Kansas-Nebraska was permitted to deliver under its certificate of convenience and necessity, 8,000 MCF per day.

According to the billings, Exhibits 3, 8,631 MCF were actually used on January 1 and 8,731 MCF were actually used on January 2, 1971, the dates assertedly used as benchmarks in the plaintiff's calculations. This differs from the quantity the plaintiff's figures demonstrate would have been needed to produce the amount of anhydrous ammonia actually produced on those two days, thus raising a question of the accuracy of the plaintiff's figures.

The problem of whether damages should be awarded for failure to deliver an amount of gas exceeding the authorized maximum is not easy of solution. The court notes, however, that the amount actually received and paid for by Farmland, both immediately before and for over a year after the restoration of service, exceeded in the vast majority of days the authorized daily maximum. Under those circumstances, justice does not permit the defendant to receive the benefit of the maximum limitation of its certificate of convenience and necessity in the computation of damages.

4. I have used the present rate at which gas is furnished to Farmland Industries, rather than the old contract rate urged by the plaintiff.

its certificate of convenience and necessity, until such time as the Federal Power Commission approves an abandonment by Kansas-Nebraska. This will be done, but no injunctive relief will be granted.