The CITY OF GAINESVILLE and the Gainesville-Alachua County Regional Utilities Board, the Lake Worth Utilities Authority, the Utilities Commission of New Smyrna Beach, the Sebring Utilities Commission, the Cities of Alachua, Bartow, Ft. Meade, Homestead, Kissimmee, Mount Dora, Newberry, St. Cloud, Starke, and Tallahassee, Florida, Plaintiffs,

v.

FLORIDA POWER & LIGHT COMPANY, Defendant.

No. 79–5101–Civ–JLK.

United States District Court,
S. D. Florida,
Miami Division.

April 18, 1980.

Alan J. Roth and Robert A. Jablon, Spiegel & McDiarmid, Washington, D. C., Joseph C. Jacobs, Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, Fla., for plaintiffs.

Daniel M. Gribbon, Covington & Burling, Washington, D. C., William Killian, Steel, Hector & Davis, Miami, Fla., for defendant.

### ORDER ON CROSS–MOTIONS TO DISMISS

JAMES LAWRENCE KING, District Judge.

At issue in this complex antitrust case are cross-motions to dismiss the defendant's counterclaim and to dismiss various portions of the plaintiffs' complaint. The plaintiffs in this action are fourteen small to medium-sized Florida cities and city utilities (hereinafter, the Cities). The single defendant is Florida Power and Light Company (hereinafter, FPL), the largest electric utility in Florida. In their complaint, the Cities allege that FPL has violated the federal antitrust laws, the Federal Power Act, the Natural Gas Act, and various state antitrust statutes in its sales practices with respect to electric power and arrangements which secured natural gas to be used in the production of electricity. FPL denies the alleged violations and counters with its own charge that the Cities have conspired amongst themselves to violate federal and state antitrust law and interfere tortiously with FPL's relationship with other municipalities.

The Cities moved to dismiss FPL's counterclaim, contending that it does not satisfy

modern pleading requirements and that all of the activities alleged in the counterclaim are protected by the First Amendment. FPL moved to dismiss for various reasons those portions of the complaint which rely on the Federal Power Act, the Natural Gas Act, the Clayton Act, and Florida's "Little FTC Act." After full briefing and oral argument, the Court took both motions under advisement.

The Court regrets the length of its present order. However, the several novel and complex issues raised by the parties merit detailed exposition.

The Court has reached the following conclusions. (1) FPL's counterclaim fails to satisfy modern pleading requirements and therefore should be dismissed without prejudice to file an amended counterclaim within thirty days. (2) The Cities' claims under the Federal Power Act and the Natural Gas Act should be dismissed because neither of those Acts contain the implied private right of action necessary for obtaining relief in court. (3) The Cities' claims under the Clayton Act, as amended by the Robinson-Patman Act, should not be dismissed since electricity is a "commodity" entitled to the antitrust protection of the Clayton Act. (4) The Cities' claims under the Florida "Little FTC Act" should be dismissed without prejudice to reassert those claims in state court proceedings because this Court declines to determine state policy by interpreting the scope of the regulated business exemption to that state statute. Each of these matters is treated more fully below.

With these initial procedural matters thus determined, the Court trusts that both parties will litigate the substance of the various remaining claims in the same expeditious manner demonstrated thus far. Both sides have promised no less in their oral presentations.

### 1. The Motion to Dismiss Defendant's Counterclaim

The Cities moved pursuant to Fed.R. Civ.P. 12(b)(6) to dismiss FPL's counterclaim for failure to state a claim upon which relief can be granted. In support of their motion, the Cities argue that: (1) the counterclaim is insufficient to state a claim under Fed.R.Civ.P. 8(a) as a matter of the general pleading requirements; and (2) even if sufficient to survive the Rule 8(a) challenge, the counterclaim fails as a matter of law because all of the activities alleged in furtherance of the supposed conspiracy are immune, as a matter of fact and law, from antitrust liability under the "Noerr-Pennington" doctrine. FPL responds that (1) the counterclaim, albeit brief, satisfies the requirements of "notice" pleading and (2) it requires discovery to unearth the relevant facts which would remove the plaintiffs' actions from the protection of Noerr-Pennington.

■ The Court concludes that the counterclaim fails to satisfy Rule 8(a) and therefore dismisses the counterclaim without prejudice to file an amended counterclaim within thirty days. A full discussion of the reasons for the present decision should guide both parties on subsequent motions if an amended counterclaim is filed.

The counterclaim is stated briefly, but includes much in its sweep.[1] Primarily it

---

1. The substantive portions of the counterclaim are as follows:

3. Upon information and belief, Cities have engaged in an unlawful combination and conspiracy among themselves and with others for the purpose of causing injury to FPL's business and property. The means employed by the Cities in furtherance of this combination and conspiracy have included, upon information and belief, joint and collusive conduct to obtain from FPL unreasonable and noncompensatory rates, terms and conditions for the purchase by them of wholesale power and transmission services;

the commencement of numerous proceedings, including this litigation against FPL for the specific purpose, and with the specific intent, of coercing and harassing FPL into agreeing to demands made by the Cities of FPL; and attempting to induce municipalities in the State of Florida not to grant or renew franchises authorizing FPL to supply electricity to those municipalities and their residents.

4. The actions by the Cities set forth in paragraph 3 above violate Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 501.204(1) and 542.05 of the Florida Statutes,

alleges the existence of a conspiracy in violation of the Sherman Act to harm FPL, a conspiracy which (a) sought unreasonable and unspecified rates and other terms from FPL, (b) commenced numerous unnamed proceedings to harass and coerce FPL and (c) sought to persuade various unnamed municipalities not to grant or renew FPL franchises. After a short discussion of the general pleading requirements and their rationale, the Court will discuss the requirements for pleading what has come to be known as the *Noerr-Pennington* "sham" exception which is implicated in the two latter activities of the alleged conspiracy. Finally, the Court will turn to the allegation of conspiracy to seek unreasonable rates and other terms from FPL and the various non-Sherman Act portions of the counterclaim.

### A. *Notice Pleading and Motions to Dismiss*

■ As has been stated by the Supreme Court, the Federal Rules were designed to realize the liberal concept of "notice pleading." *See, e. g., Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). In doing so, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." 355 U.S. at 48, 78 S.Ct. at 103. As long as the pleadings "give the defendant fair notice of what the plaintiffs claim is and the grounds upon which it rests," the theory of notice pleading has been satisfied. 355 U.S. at 47, 78 S.Ct. at 103.

■ In general, the concept of notice pleading embodied in the Federal Rules applies to the "big" antitrust case as well as the "small" negligence lawsuit. This princi-

ple was reaffirmed by the Supreme Court just last month. *See McLain v. Real Estate Bd. of New Orleans, Inc.*, —— U.S. ——, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). This Court has also recognized the general application of notice pleading to antitrust litigation. *See Bazal v. Belford Trucking Co.*, 442 F.Supp. 1089, 1093 (S.D.Fla.1977).

■ Of course, even the liberality of notice pleading has its limits. The "short" statement of the pleader's claim must also be "plain" and it must show that "the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Professors Wright and Miller have noted that even the Supreme Court decision in *Conley v. Gibson* implied "that the rules do contemplate a statement of circumstances, occurrences, and events in support of the claim being presented." C. Wright & A. Miller, 5 *Federal Practice and Procedure* § 1215 at 112. Moreover, whether the pleading need present a complete formal cause of action or not, it "must contain either direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested or intended by the pleader, or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Id.* § 1216 at 121–23.

■ Naturally, what needs to be pleaded to satisfy the requirements of Rule 8(a)(2) varies with the "nature of the action, the relief sought, and the respective positions of the parties in terms of the availability of information and a number of other pragmatic matters." *Id.* § 1217 at 127. For example, it has long been the law of this Circuit that a conclusory allegation of a conspiracy to restrain trade will not survive a motion to dismiss.[2]

and constitute a tortious interference with advantageous relationships maintained by FPL with municipalities that have issued franchises to FPL.

2. *See, e. g., Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273–74 (5th Cir. 1979) (*per curiam*) (adopting the district court's Memorandum Opinion and Order) (and cases cited therein); *cf. Quinonez v. National*

*Ass'n of Securities Dealers, Inc.*, 540 F.2d 824, 828 (5th Cir. 1976) (the pleading need not list "with evidentiary specificity the acts complained of," but it "must comprehend a so-called prima facie case") ("the alleged violations when combined with the rather complete exegesis of the facts relating to the plaintiff's plight gave ample notice of what was complained of"); *Brett v. First Federal Savings & Loan Ass'n*, 461 F.2d 1155, 1158 (5th Cir. 1972)

■ FPL cites numerous cases from the Fifth Circuit [3] which caution district courts against the too ready dismissal of both antitrust and other claims. It is axiomatic that when a complaint or counterclaim is challenged under Rule 12(b)(6), the court "must accept the facts which are well-pleaded to be true and resolve them in the light most favorable to plaintiffs [or counterclaimants]." *See, e. g., Brett v. First National Savings and Loan Ass'n*, 461 F.2d 1155, 1157 (5th Cir. 1972). However, such deference to the statements of the complaint must not extend to completely conclusory statements which fail to give adequate notice to the opposing party or the court. In addition, the pleader should not be able to rely *solely* on enigmatic averments which on their face comprehend activity clearly exempt from liability.

### B. *Pleading the Noerr-Pennington Sham Exception*

#### 1. *Noerr-Pennington in General*

■ To a great degree, the Supreme Court has immunized from antitrust liability concerted action by individuals to influence the government. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court immunized concerted attempts to influence legislative action through jointly-financed publicity campaigns directed at voters. Four years later in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court held that such an immunization from antitrust liability extended to efforts to influence officials in the executive branch of government. Finally, in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court further extended this antitrust immunity to concerted efforts to litigate and concerted efforts before administrative agencies.

Several bases were advanced in this line of cases for the immunization of the above activities from the antitrust laws, but the most weighty reason was the otherwise inevitable conflict with the First Amendment right of free speech and right to petition the government. *See, e. g., Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 542 (5th Cir. 1978) *citing* Fishel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine*, 45 U.Chi.L.Rev. 80 (1977).

From its inception, the *Noerr-Pennington* doctrine had a built-in exception. In *Noerr* [*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., et al.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464] the Court noted in *dicta* that a sham publicity campaign would nevertheless be actionable under the anti-trust laws. 365 U.S. at 144, 81 S.Ct. at 533. This exception provided the basis for the Court's decision in *California Motor* that a complaint had properly alleged "the 'sham' exception . . . as adapted to the adjudicatory process." 404 U.S. at 516, 92 S.Ct. at 614. *See generally* P. Areeda & D. Turner, 1 *Antitrust Law* ¶ 203 (1978).

The precise dimensions of the sham exception to *Noerr-Pennington* are far from clear. A majority of the Supreme Court has not focused on this matter since *Califor-*

("[a]lthough plaintiffs may be unable to allege specific facts proving actual acts of agreement or conspiracy, the pleadings are sufficient if they set forth facts from which an inference of unlawful agreement can be drawn").

Other courts of appeal and commentators agree that a conclusory allegation of an antitrust violation will not suffice. *See, e. g., Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98 (2d Cir. 1972); *SCM Corp. v. Radio Corporation of America*, 407 F.2d 166 (2d Cir. 1969); Wright & Miller, *supra* § 1228 at 170; 2A Moore's Federal Practice ¶ 8.17[3] at 1752 (1978–79 Cumulative Supplement).

**3.** *E. g., Banco Continental v. Curtiss National Bank*, 406 F.2d 510, 514 (5th Cir. 1969); *Barber v. Motor Vessel "Blue Cat,"* 372 F.2d 626, 627 (5th Cir. 1967); *City of Fort Lauderdale v. East Coast Asphalt Corp.*, 329 F.2d 871, 872 (5th Cir. 1964); *Shull v. Pilot Life Insurance Co.*, 313 F.2d 445, 447 (5th Cir. 1963).

*nia Motor.*[4] Lower courts have variously interpreted the sham exception, but in general the lower courts have tried to prevent the sham exception from vitiating the First Amendment benefits of the *Noerr-Pennington* doctrine. *See generally* J. von Kalinowski, 7 *Antitrust Laws and Trade Regulation* § 46.04[5] at 46–62 (1979); Fischel *supra*, 45 U.Chi.L.Rev. at 104–10.

In the context of litigation and formal administrative hearings, the sham exception may cover a number of situations. However, the essence of the sham in *California Motor* is that the litigant in court or the party before an administrative agency does not really want the relief ostensibly sought from the court or agency. Such would be the case where, for example, the litigant or party initiates litigation or administrative hearings effectively to prevent meaningful access to those fora by his competitor. Such was the allegation highlighted by the Supreme Court in *California Motor.* This type of situation would also include instances in which collateral meritless litigation is initiated to frustrate a competitor's sale of bonds. *See United States v. Otter Tail Power Co.*, 331 F.Supp. 54 (D.Minn.1971) *aff'd in part, remanded in part*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *on remand*, D.C., 360 F.Supp. 451 (1973) *aff'd without opinion* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).[5]

FPL argued in its memorandum and at oral argument that the Cities' motive is the key factor in determining whether that part of its counterclaim which rests on "improper" judicial and administrative proceedings comes within the sham exception to *Noerr-Pennington.* Memorandum at 9–11, Transcript at 26–27. Unfortunately, FPL never focuses on the "motive" required to constitute a sham proceeding.

 Without a doubt, the intention to harm a competitor is *not* sufficient to make litigation or administrative proceedings a sham. That anticompetitive motive is the very matter protected under *Noerr-Pennington.*[6] Rather, the requisite motive for

---

4. However, the sham exception has come up tangentially in a number of cases. *See, e. g., City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (municipalities not excluded by state action exemption from the reach of an antitrust counterclaim which included sham allegations); *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 n.6, 97 S.Ct. 2881, 2889 n.6, 53 L.Ed.2d 1009 (1977) (plurality opinion) (*California Motor* unaffected by decision on federal anti-injunction statute); *id.*, 433 U.S. at 644, 97 S.Ct. at 2894 (Blackmun, J., concurring in the result) (*California Motor* requires repetitive series of sham lawsuits); *id.*, 433 U.S. 660–62, 97 S.Ct. at 2902–03 (Stevens, J., dissenting) (*California Motor* requires only single sham lawsuit); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Stewart, J., dissenting) (discussion of state action immunity from antitrust laws); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (remanding for reconsideration in light of *California Motor*) *aff'd without opinion following remand* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).

5. A wholly different type of "sham" may arise where a litigant or party actually wants the relief sought from the court or agency but perpetrates the equivalent of fraud on that body. *See generally* P. Areeda & D. Turner, 1 *Antitrust Law* ¶ 204 (1978). The pre-*California Motor* Fifth Circuit decision in *Woods Explora-*

*tion & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286 (5th Cir. 1971), perhaps retains vitality on this basis. However, nowhere in the counterclaim, the memoranda submitted by FPL, or at oral argument is there even the slightest trace that such an alleged fraud by the plaintiffs might be the basis for the counterclaim. Hence, this Court has not considered that type of possible sham on this motion.

6. The Supreme Court cases on point are replete with references that anticompetitive motive *per se* does not eliminate *Noerr-Pennington* immunity. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138–39, 81 S.Ct. 523, 530, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 669, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965) ("Nothing could be clearer from the Court's opinion than that anticompetitive purpose did not illegalize the conduct there involved"); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972) ("any carrier has the right of access to agencies and courts, within the limits, of course, of their prescribed procedures, in order to defeat applications of its competitors"). *See also* P. Areeda & D. Turner, 1 *Antitrust Law* ¶ 202 (1978).

The Fifth Circuit has recognized that an anticompetitive motive does not make a complaint

the sham exception is the intent to harm one's competitors not by the *result* of the litigation but by the simple fact of the *institution* of litigation. Without a proper allegation of such a motive and well-pleaded facts which could lead this court to infer such a motive, a claim under the sham exception is fatally defective.

### 2. *This Counterclaim*

■ The entire allegation in the counterclaim on the initiation of court and agency proceedings is as follows: ·

> Upon information ·and belief, Cities have engaged in an unlawful combination and conspiracy among themselves and with others for the purpose of causing injury to FPL's business and property. The means employed by the Cities in furtherance of this combination and conspiracy have included . . . the commencement of numerous proceedings, including this litigation, against FPL for the specific purpose, and with the specific intent, of coercing and harassing FPL into agreeing to demands made by the Cities of FPL . . . . .

On its face this portion of the counterclaim fails for two reasons. First, it is entirely conclusory and the remainder of the counterclaim does not contain any less conclusory allegations with respect to such "proceedings." *See Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273–74 (5th Cir. 1979) (*per curiam*) (adopting the district court's Memorandum Opinion and Order). Second, on its face, this allegation includes conduct immunized by *Noerr-Pennington* and not excepted as a sham. If the Cities have conspired to initiate proceedings

to "coerce" FPL to agree to their "demands," such conduct is still immunized if the coercion was to be by the *decisions* handed down by the respective court or administrative body. As discussed above, to come within the sham exception and therefore to be actionable, the circumstances must reflect that the Cities intended to coerce FPL irrespective of the merits of the litigation or administrative proceedings. Since FPL has not alleged such intent and has not alleged facts from which this Court could infer such intent, this portion of its counterclaim must fail.[7]

■ Even more apparent is the infirmity of FPL's conclusory allegation that, in furtherance of the alleged conspiracy, the Cities attempted "to induce municipalities in the state of Florida not to grant or renew franchises authorizing FPL to supply electricity to those municipalities and their residents." This portion of the counterclaim fails because (1) it is entirely conclusory with no less conclusory allegations elsewhere in the counterclaim; and (2) it does not contain a proper allegation of sham motive by the Cities and facts from which such motive could be inferred, which would *remove* the conduct from *Noerr-Pennington* immunity.[8]

Two further observations ought to be added at this point. First, FPL's argument that it ought to be permitted discovery on the basis of its conclusory allegations despite *Noerr-Pennington* misses the mark. Certainly, FPL is as familiar with prior litigation, administrative proceedings, and franchise applications as the Cities would be. If it can allege absolutely nothing from

---

a sham. *I. T. T. Corp. v. United Telephone Co.*, 550 F.2d 287, 289 (5th Cir. 1977) (*per curiam*).

**7.** Many various factual allegations, which need not be detailed here, could provide a reasonable basis for inferring the requisite intent. It is reasonable to expect such allegations since, as Professors Areeda and Turner have noted, the *California Motor* sham exception is judged not by a subjective test but by an objective standard. P. Areeda & D. Turner, 1 *Antitrust Law* ¶ 203b at 41 (1978).

**8.** As is clear from this decision, the Court concludes that the awarding of electricity franchis-

es by municipalities is a discretionary political act and therefore efforts to influence that award which are neither a sham nor fraudulent are covered by *Noerr-Pennington*. *See* Fla. Const., Art. VIII, § 2(b) (1968 rev.); Fla.Stat. § 166.042(1); *State v. Dade County*, 142 So.2d 79, 87 (Fla.1962); *see generally* 11 *Fla.Jur. Electricity and Gas* §§ 5–7; 14 *Fla.Jur. Franchises* §§ 5–10; *cf.* P. Areeda & D. Turner, 1 *Antitrust Law* ¶ 206d3 (1978) (grant of an exclusive franchise by a governmental entity does not violate antitrust laws).

which a sham motive could be inferred and if it is unwilling to allege the requisite sham motive, the short answer is that it should be entitled to no discovery.

Second, the Court does not consider the pleading requirements set out above as manifesting some special heightened pleading burden. In *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir. 1976), a divided Ninth Circuit panel imposed such a special burden on pleaders who attempt to allege an antitrust claim using the sham exception to *Noerr-Pennington*. Although parts of the *Franchise Realty* majority's rationale are persuasive, there is no need to construct such a heightened pleading burden if the courts simply apply the normal pleading standards.

### C. *Other Aspects of the Counterclaim*

Because the portions of the counterclaim which rely on prior litigation, administrative proceedings, and municipal franchising should be dismissed, the Court concludes that the entire counterclaim based on Section 1 of the Sherman Act should be dismissed. The Court notes the completely conclusory nature of the remaining allegation that the Cities undertook "joint or collusive conduct to obtain from FPL unreasonable and noncompensatory rates, terms and conditions for the purchase by [the Cities] of wholesale power and transmission services." Moreover, this Court should not be called upon to perform reconstructive surgery on FPL's counterclaim when it may provide FPL the opportunity to do so itself by way of an amended counterclaim.

 As alternative bases for its counterclaim, FPL asserts that the conduct alleged against the Cities also violated Sections 501.204(1) and 542.05 of the Florida Statutes and constituted tortious interference with advantageous relationships. Since the basis for the *Noerr-Pennington* doctrine lies in the First Amendment, it follows that *Noerr-Pennington* also immunizes conduct under state antitrust statutes. Finally, FPL did not contest that its counterclaim

failed to state a claim for tortious interference with business relations, and this Court so holds.

### II. *FPL Motion to Dismiss: Federal Power Act and Natural Gas Act Claims*

FPL seeks the dismissal of the claims of the Cities which are based upon alleged violations of the Federal Power Act, specifically 16 U.S.C. §§ 824d & 824e, and the Natural Gas Act, specifically 15 U.S.C. §§ 717c, 717d & 717f. FPL contends that there exist no pertinent private rights of action under those statutes. In response, the Cities argue that both acts contain implied private rights of action, at least to the extent necessary to vindicate the particular rights which they allege have been violated by FPL.

 The Court concludes that neither act contains the necessary private right of action. As preliminary matter, this Order will set out the standard to be applied in inferring private rights of action. That standard will be applied in turn to each of the acts in question.

### A. *Inferring Private Rights of Action*

In a recent Fifth Circuit case, Judge Goldberg observed, in dissent:

> Only a cave dweller or other layman would not realize that there has been a remarkable change of attitude by the Supreme Court regarding the inference of private rights of action in the last fifteen years.

*Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1088 (5th Cir. 1980) (Goldberg, J., dissenting). Being neither a cave dweller nor a layman, this Court also recognizes the recent change in the Supreme Court's approach to the inference of private rights of action. However, the shifting attitude has not been confined simply to recent years.

The first case in which the Supreme Court found an implied right of action was *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916). See *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 250 n.2,

62 L.Ed.2d 146 (1979) (White, J., dissenting). For nearly a half a century thereafter, the Supreme Court inferred relatively few private rights of action from statutes which were silent on their face with respect to such private enforcement. *Cannon v. University of Chicago*, 441 U.S. 677, 733–35, 99 S.Ct. 1946, 1976–77, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting). Then in *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), a unanimous Supreme Court held that a private right of action was to be inferred from the Congressional silence in Sections 14(a) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a) & 78aa, using some rather broad language.[9] In all of the next five cases to go to the Supreme Court, a private cause of action was also found. *See Cannon v. University of Chicago*, 441 U.S. at 698 n.23, 99 S.Ct. at 1958 n.23. *But see id.*, 441 U.S. at 738, 99 S.Ct. at 1979 (Powell, J., dissenting) (discussing *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964)).

Just over a decade after *Borak*, a unanimous Court supplemented its prior decisions with a four-part analytical framework which it found to be "relevant" in inferring private rights of action.[10] *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Unanimity was short-lived. Indeed, three recent cases have split the Supreme Court, effectively overruled the approach in *Borak*, and called the relevance of *Cort's* analytical framework into question. *See Transameri-*

*ca Mortgage Advisors, Inc. v. Lewis*, —— U.S. ——, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Apparently, *Cort* was an attempt to synthesize the case law after *Borak*. Perhaps *Cort* was also intended to narrow somewhat *Borak's* broad invitation to infer a scheme of private enforcement whenever a federal right had been created by Congress. If such was the intent behind *Cort*, it failed. *See Cannon v. University of Chicago*, 441 U.S. 677, 740–42, 99 S.Ct. 1946, 1980–81, 60 L.Ed.2d 560 (Powell, J., dissenting) (and the twenty appeals court cases cited therein).

In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court used the *Cort* factors to infer a private right of action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. However, the majority opinion cautioned lower federal courts in their application of *Cort*:

[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person. Instead, before concluding that Congress intended to make a remedy available to a special class of litigants, a court must carefully analyze the four factors that

---

**9.** In discussing whether to infer a private right of action to enforce proxy violations, the Court turned to the legislative history of the Securities Exchange Act and quoted from various committee reports. It then concluded:

> While this language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve that result. . . .
> Private enforcement of the proxy rules provides a necessary supplement to Commission action.

377 U.S. at 432, 84 S.Ct. at 1559–60. Numerous litigants have seized on the "necessary supplement" approach in arguing for inference of new private rights of action. *See, e. g., Touche Ross* and *Transamerica* cases discussed *infra*.

**10.** In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted," . . . —that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And. finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted).

*Cort* identifies as indicative of such an intent.

441 U.S. at 688, 99 S.Ct. at 1953. In conclusion the majority noted:

> When Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights. But the Court has long recognized that under certain limited circumstances the failure of Congress to do so is not inconsistent with an intent on its part to have such a remedy available to the persons benefited by its legislation. Title IX presents the atypical situation in which *all* of the circumstances that the Court has previously identified [in *Cort*] as supportive of an implied remedy are present.

441 U.S. 677, 99 S.Ct. at 1967. These sentiments were underscored by Justice Rehnquist (joined by Justice Stewart) who stated:

> Not only is it 'far better' for Congress to so specify when it intends private litigants to have a cause of action, but for this very reason this Court in the future should be extremely reluctant to imply a cause of action absent such specificity on the part of the Legislative Branch.

441 U.S. at 718, 99 S.Ct. at 1968 (Rehnquist, J., concurring). Evidently the Court's strict construction of *Cort* was not strict enough for the three dissenters, two of whom argued that a proper application of *Cort* would lead to no inference of a private right of action [11] and one of whom called for the wholesale rejection of *Cort*.[12]

Shortly after *Cannon*, the Supreme Court decided *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), which declined to infer a private right of action under § 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a). Writing for the majority, Justice Rehnquist did not apply the full four-part analysis of *Cort*, but rather only discussed the lack of Congressional intent to create a private right of action. Despite the argument that a private right of action was "necessary to 'effectuate the purpose of the section' " (the third *Cort* factor, albeit modified), the Court refused to consider this argument, stating that the "central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." 442 U.S. 575, 99 S.Ct. at 2489.[13] Moreover, the Court specifically disapproved of the approach taken in *Borak.*[14]

Finally, in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) the Court concluded that "there exists a limited private remedy under the Investment Advisers Act of 1940 to avoid an investment advisers contract, but that the Act confers no other private causes of action legal or equitable." 100 S.Ct. at 249. The five-justice majority again declined to use the four-part *Cort* analysis stating:

> The dispositive question remains whether Congress intends to create any such remedy. Having answered that question in the negative, our inquiry is at an end.

444 U.S. at 24, 100 S.Ct. at 249. The four dissenters in *Transamerica* did apply the four *Cort* factors as the criteria for discerning Congressional intent and argued that a full private right of action ought to be inferred from the statute then under consideration.

---

11. 441 U.S. at 718–30, 99 S.Ct. at 1968–74 (White, J., dissenting) (joined by Blackmun, J.).

12. 441 U.S. at 730–49, 99 S.Ct. at 1974–85 (Powell, J., dissenting).

13. Justice Brennan, who concurred in the majority opinion, interpreted that opinion as merely holding that when the first two *Cort* factors are not present, "the remaining two *Cort* factors cannot by themselves be a basis for imply-

ing a right of action." 442 U.S. 580, 99 S.Ct. at 2491 (Brennan, J., concurring).

14. To the extent our analysis in today's decision differs from that of the Court in *Borak,* it suffices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today.
442 U.S. 578, 99 S.Ct. at 2490.

■ These last two cases in which Supreme Court majorities refused to apply the complete *Cort* analysis would indicate that the precedential value of this five-year-old case is in doubt. There is, however, one way to reconcile these recent Supreme Court decisions. Instead of the four-part analysis being the basis for judicial inference of private rights of action in the *absence* of Congressional intent, the test may be a useful but nonessential adjunct in interpreting the various expressions of Congressional intent. Such expressions of intent are to be found in the language and structure of the statute and in the pertinent legislative history. Thus, the *Cort* factors are to be applied where to do so assists a Court in statutory construction. *See, e. g., Transamerica*, 100 S.Ct. at 245; *Touche Ross*, 442 U.S. at 568, 99 S.Ct. at 2485. This approach has been followed by the Fifth Circuit. *See generally Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1078 (5th Cir. 1980).

■ One final question remains on the standard to be applied. The pertinent provisions of the Federal Power Act and the Natural Gas Act were originally enacted in 1935 and 1938 respectively. Should the most recent standards for inference of private rights of action be applied to them retroactively? This question would be far more troublesome if these statutes were enacted during the decade between *Borak* and *Cort* when there was little judicial guidance on the private enforcement implications of silent statutes. *See, e. g., Cannon v. University of Chicago*, 441 U.S. at 698–99, 99 S.Ct. at 1958 (in analyzing Title IX of the Education Amendments of 1972, the *Cort* text applied, "but our evaluation of Congressional action in 1972 must take into account its contemporary legal context"). The contemporary legal context in which both of these statutes were enacted was one in which private remedies were rarely inferred, which is compatible with the renewed strict approach of the recent Supreme Court decisions discussed above. Hence, the most recent standards apply.

### B. *Federal Power Act*

The Cities assert that there exists a limited private right of action under Sections 205 and 206 of the Federal Power Act, codified at 16 U.S.C. §§ 824d & 824e. In brief, the Cities claim that this limited private right of action permits a party to sue to redress conduct which the Commission has already determined violates the Federal Power Act.[15] Sections 205 and 206 are silent in this regard. FPL contends that there is no such private right of action, relying primarily on *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

In *Montana-Dakota* the plaintiff electric company sued another electric company contending that (1) the rates the plaintiff had paid for wholesale electricity were unreasonable, in violation of Section 205, 16 U.S.C. § 824d(a), and (2) the plaintiff company had been deprived of its ability to seek an administrative remedy from the Federal Power Commission through the fraudulent abuse of an interlocking corporate relationship. The Supreme Court held that there existed no private right of action to recover for unreasonable rates in the face of an implicit Commission decision that the rates paid were reasonable. The Supreme Court relied upon the nature of the administrative determination of reasonableness:

Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete ex-

---

15. Specifically, the Cities argue that FPL has refused to sell them firm wholesale power in violation of its tariff schedule. The Cities state that this refusal has been determined to be unlawful in several Commission proceedings. Plaintiffs' Memorandum at 14–17 citing *Florida Power & Light Co.*, Docket Nos. ER78–19, Opinion No. 57 (August 3, 1979); *Florida Power & Light Co.*, Docket No. EL78–4, Order Terminating Proceeding (Nov. 8, 1979); *Id.* Staff Report (April 7, 1978). FPL vigorously contests both this characterization of its actions and the Cities' interpretation of the Commission's decisions.

pression in dollars and cents is the function of the Commission. It is not the disembodied "reasonableness" but that standard when embodied in a rate which the Commission accepts or determines that governs the rights of buyer and seller. A court may think a different level more reasonable. But the prescription of the statute is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce.

341 U.S. at 251, 71 S.Ct. at 695. Assuming that the Cities can show that the Commission has *already found* the conduct alleged in the complaint to violate the Act, *Montana-Dakota* does not control whether there exists the limited private right of action asserted by the Cities.

### 1. *Legislative History*

As noted already, Sections 205 and 206 of the Federal Power Act are silent with respect to whether they were intended to include a private right of action. Given this silence, expressions of intent in the legislative history of the Act may be determinative. Neither party has cited any apposite legislative history, relying instead on arguments derived from the wording of the silent statute and the gloss given the Act by later judicial decisions. The Court is less willing to ignore the legislative history of the Federal Power Act.

The Act's statutory predecessor was enacted in 1920 as the Federal Water Power Act, but it did not contain the provisions now under consideration. Congress enacted the relevant provisions in the Public Utility Act of 1935 which amended the Act. From the spirited Congressional debate in 1935, it is apparent that the amendments were controversial. However, rather than focusing on the provisions which applied to ratemaking and other regulation of interstate sales of wholesale power, the Congressional debate centered around the provisions of the 1935 amendments which were designed to eliminate or regulate massive utility holding companies. The references to the regulation of interstate sales of power were sparse and conclusory. Nonetheless, they provide some helpful guidance.

The Senate committee which reported out the bill that eventually became the 1935 enactment noted that the percentage of power generated which crossed state lines was rising and that the Supreme Court had "placed the interstate wholesale transactions of the electric utilities entirely beyond the reach of the States." S.Rep.No.621, 74th Cong., 1st Sess. 17 (1935) *citing Public Utilities Comm. v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927). After further noting that federal leadership was needed, the committee summarized the new provisions regulating the interstate sale of power as follows:

> Part 2 [the relevant section of Title II of the bill] places the utilities under the regulated conditions which have been prescribed for the principal other national utilities. Commission approval is required before they may issue new securities or consolidate or transfer their operating properties. The Commission is authorized to prescribe the form in which their accounts are to be kept. The sale price of energy sold at wholesale in interstate commerce is made subject to Commission determination.
>
> . . . *This entire act is to be administered by the Federal Power Commission.*

S.Rep.No.621, *supra* at 18 (emphasis added). In particular, Part 2 of the bill included Sections 205 and 206 which outlined the procedure under which the utilities had a duty to charge "just and reasonable rates for every service subject to the jurisdiction of the Commission." *Id.* at 51. *See also,* H.Rep.No.1318, 74th Cong., 1st Sess. 29 (1935). Sections 205 and 206 also specified that rates were to be filed with the Commission and that the Commission was to review and investigate those rates. These portions of the bill passed the Senate, were reported from the House committee, and passed the House without significant debate and virtually unchanged. For example, despite the lengthy debates over the holding company aspects of the bill, the only comment on the Senate floor with respect to

these portions of the bill was made by Senator Wheeler, its legislative shepherd through the Senate:

> Mr. President, I do not think I shall go into a discussion of title II of the bill. In the committee there was very little if any discussion with reference to it. It merely amends the present law, and gives the Federal Power Commission the right to regulate the interstate transmission of and wholesale rates for electrical energy and extends control over the waters of this country over which the Congress of the United States has control already. *All the way through title II it is specifically provided that the Federal Power Commission shall have the power to do this or do that with respect to the matters over which the Commission or Congress has jurisdiction at the present time.*

79 Cong.Rec. 8444 (1935) (emphasis added).[16]

This brief sketch of the legislative history of Sections 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d & 824e,[17] demonstrates that Congress in 1935 intended to create a fairly common rate-making and regulatory scheme for interstate electricity. Sections 205 and 206 form just a small part of an overall regulatory scheme in which Congress designated the Federal Power Commission (now the Federal Energy Regulatory Commission) as the body to oversee interstate utilities in the public interest. As indicated by the Supreme Court in *Montana-Dakota*, in such a regulatory scheme the Courts have little role to play "except for review of the Commission's orders." 341 U.S. at 252, 71 S.Ct. at 695. This case involves neither the review of a Commission order (such review being available only in the Court of Appeals), nor an action brought by the Commission itself to enforce one of its orders. *See* 16 U.S.C. §§ 825*l*(b) and 825m.

### 2. "Plain Wording"

In support of its contention that Congress intended to create a limited *private* right of action, the Cities point to the "plain wording" of Section 317 of the Act, codified at 16 U.S.C. § 825p:

> The District Courts of the United States and the United States courts of any Territory or other place subject to the Jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to en-

---

**16.** Similarly, the debate in the House centered around the holding company aspects of the legislation. Only two members of the House commented at length on the rate-making and regulatory aspects of Title II. *See* 79 Cong. Rec. 10377–79 (1935) (Comments of Rep. Lea); *id.* at 10381–89 (Comments of Rep. Cole). Interestingly enough, both Representatives Lea and Cole intimated that the "just and reasonable" language in Section 205 was solely a standard to be used by the Commission in fulfilling its rate-making function:

> This bill also involves the question as to the rate base that should apply in governing the rates for public utilities. The bill contains the general rule that rates must be just and reasonable. The committee would like to have been able to provide a better standard of valuation as a rate-making base, but after considering the question fully we determined that it would be a futile thing to do. After the recent decision of the Supreme Court in a Maryland telephone case it is practically a futile thing, in my judgment, for any legislative body to try to write a rate-making base.

*Id.* at 10378 (Comments of Rep. Lea); *accord. id.* at 10384 (Rep. Cole). There was no hint that either Sections 205 or 206 would provide the basis for a private cause of action.

**17.** Sections 205 and 206 have not been amended since their enactment in 1935 except for the enlargement of the period for notice of rate changes from thirty to sixty days and the addition of provisions on automatic adjustment clauses. Public Utility Regulatory Policies Act of 1978, Pub.L. 95–617, Title II, §§ 207(a), 208, 92 Stat. 3142 (Nov. 9, 1978). Interestingly enough, other provisions of the 1978 Act expand the jurisdiction of the Commission with respect to the wholesale distribution of electric energy. *See, e. g.,* Section 202 (Interconnection orders). If the 1978 Act affects the decision in the instant case at all, it reaffirms the Congressional purpose of regulating interstate electricity through the Commission and not through private litigation in federal courts. The present Congress is seeking ways in which to improve regulatory efficiency, *e. g.,* Section 207(b) (requiring a study of rate-making procedures), rather than a means of circumventing the Commission's processes.

force any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder. The Cities argue that the reference to "suits in equity and actions at law" is meaningless if it does not imply private enforcement actions since other provisions in the Act "fully authorize the Commission to seek injunctive relief in federal district court against violations of the Act" (citing Section 314(a), 16 U.S.C. § 825m(a)) and the Commission "does not sue for damages." Plaintiffs' Memorandum at 5.

■■■■ The Cities confuse grants of jurisdiction with provisions for causes of action. Their argument implies that Section 314(a), 16 U.S.C. § 825m(a) [18], is a grant of jurisdiction which makes the jurisdictional grant in Section 317, 16 U.S.C. § 825p, superfluous unless Section 317 can be interpreted as going beyond Section 314(a). On the contrary, Section 314(a) is merely a provision which creates a federal cause of action in favor of the Commission and empowers the Commission to prosecute such an equitable action.[19] When this is recognized, it becomes clear that the reference to "suits in equity" in Section 317 is not super-fluous but rather part of the jurisdictional grant that complements the Section 314(a) equitable cause of action. With respect to the reference to "actions at law" in Section 317, as the plaintiffs themselves noted, the Federal Power Act does contain at least one explicit private cause of action for damages. Plaintiffs' Memorandum at 3 *citing* Section 10(c) of the Act, 16 U.S.C. § 803(c). The reference to "actions at law" in Section 317, is merely the jurisdictional grant which complements the Section 10(c)—and possibly other—explicit private causes of action for damages. Given that the jurisdictional grant in Section 317 can be connected to explicit causes of action created by the Act, there can be no inference whatsoever that this jurisdictional grant evinces a Congressional intent that a private right of action be available in the present case.[20]

In contrast to the interpretation of the Act urged by the plaintiffs, the statute on its face provides an explicit manner in which electric companies who violate Commission decisions are to be brought before the district court. As already noted, *the Commission* may seek to enforce its orders pursuant to Section 314(a). Indeed, the

**18.** Section 314(a) provides, in pertinent part:
Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may *in its discretion bring an action* in the proper District Court of the United States, the United States District Court for the District of Columbia, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond.
16 U.S.C. § 825m(a) (emphasis added).

**19.** In contrast, when Congress intended to grant jurisdiction in the federal courts, it did so explicitly. For example, Section 314(b) provides, in pertinent part:
(b) Upon application of the Commission the district courts of the United States . . *shall have jurisdiction to issue writs of mandamus* commanding any person to comply with the provisions of this chapter or any

rule, regulation, or order of the Commission thereunder.
16 U.S.C. § 825m(b) (emphasis added). *See also* H.Rep. No. 1318, 74th Cong., 1st Sess. 34 (1935) (briefly discussing Section 314(a) as "authoriz[ing] the Commission to bring a civil action" whereas Section 314(b) "confers . . jurisdiction" and Section 317 "imposes . . jurisdiction").

**20.** In *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 22, 100 S.Ct. 242, 248, 62 L.Ed.2d 146 (1980), the Supreme Court relied in part on the deletion of the words "actions at law" and "liability" from the jurisdictional provision of the Investment Advisers Act of 1940 as evidence of lack of a Congressional intent to provide a private right for damages under the Act. It does not logically follow, however, that the *inclusion* of similar words in an earlier statute implies a private right of action, especially if the inclusion of similar words can be linked to explicit causes of action provided by the statute. *See Touche Ross & Co. v. Redington*, 442 U.S. 577, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (jurisdictional provision "creates no cause of action of its own force and effect").

Commission is empowered to seek enforcement *in its discretion.* Plainly, the Act's plain words fail the plaintiffs.

### 3. Cort Factors

Of course, the plaintiffs also rely on the four *Cort* factors to assist in interpreting Congressional intent. With respect to the first *Cort* factor—whether the statute creates a federal right in favor of the plaintiff—the Congressional debates illustrate that Congress hoped to benefit ultimate consumers of electricity by breaking up large utility holding companies and regulating the interstate sale of wholesale electricity. It is true that to afford ultimate consumers these benefits the Act had to vest in the companies purchasing interstate power the right to reasonable rates and service as determined by the Commission.

The second *Cort* factor consists of explicit and implicit indications of legislative intent to create or deny a private remedy. The plaintiffs point to nothing more than the jurisdictional wording already discussed above as indicative of Congressional intent to grant a private remedy. They also cite the failure of FPL to produce any statutory provision or legislative history which indicates an intent to deny private remedies of this type. On the other hand, FPL has argued that the explicit enforcement mechanisms supplied by Congress indicate a lack of intent to create private enforcement mechanisms.

■ As discussed already, the private remedy which the plaintiffs seek is the ability to enforce prior Commission determinations. Although the legislative history indicates that Congress intended to commit the rate-making and other regulatory functions under the Act solely to the Commission, this conclusion does not necessarily imply that once the Commission has determined specific conduct or some general type of conduct to be unlawful there can be no private remedy to enforce those Commission decisions. If Congress had failed to provide any provisions for review and enforcement of Commission orders, certainly such remedies might be fairly implied. In this stat-

ute, however, Congress did provide a specific avenue of review in the Courts of Appeal. *See* Section 313, 16 U.S.C. § 825*l.* Moreover, Congress delineated a multifaceted system of enforcement which includes civil actions by the Commission, mandamus proceedings, forfeiture provisions, and criminal penalties. *See* Sections 314–16, 16 U.S.C. §§ 825m–825*o.* Indeed, Congress specified that the initiation of civil enforcement proceedings was to be within the Commission's discretion. Section 314(a), 16 U.S.C. § 825m(a). Considering that (1) Congress generally intended that the Commission alone be responsible for regulating interstate sale and transmission of electricity, (2) Congress explicitly provided for private causes of action in the Federal Power Act when it saw the need, *e. g.* Section 10(c), 16 U.S.C. § 803(c), and (3) the appeal provisions explicitly specified are complete and the enforcement provisions explicitly specified by Congress are discretionary, the Court concludes that the explicit and implicit indications of legislative intent weigh against the implication of a private remedy to enforce Commission decisions.

The third *Cort* factor is whether a private right is consistent with the underlying purposes of the legislative scheme. The underlying purpose of the Federal Power Act amendments of 1935 was to bring interstate sales and transmission of power under a regulatory scheme similar to and compatible with state regulation of intrastate electricity, thereby benefitting ultimate consumers. *See, e. g.*, S.Rep.No.651, *supra*, at 18 & 48. Congress acknowledged the need to coordinate the federal regulatory scheme with those in each of the states. As an initial matter, the Court notes that such coordination would be difficult if not impossible if enforcement powers were to be given to individual, private litigants. Moreover, the plaintiffs appear to argue that private litigants ought to be able to enforce (1) alleged violations of prior, specific Commission decisions in which the alleged violator was a party before the Commission, and (2) alleged violations of general conduct which the Commission has deemed unrea-

sonable or unlawful in proceedings in which the alleged violator was not represented. With respect to the first type of "violation," the Commission in its discretion and not private litigants, can best determine when its prior order has been violated, and the plaintiffs have provided no evidence to demonstrate that the Commission is too overburdened to monitor compliance with its orders. With respect to the second type of "violation," permitting private litigants to enforce rights ostensibly secured by Commission precedent would involve the district courts in unnecessary interpretation of Commission decisions to see if they are applicable to different factual settings. In addition, there are apparent due process problems in allowing a private right of action to "enforce" a Commission decision against an alleged violator that was never a named party before the Commission. *Cf. NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). On the whole, this Court does not believe that a private remedy is consistent with the regulatory scheme established by Congress, at least where there is no evidence of the Commission's inability to enforce its own decisions.[21]

The Court's obligation is to determine, to the best of its ability, "whether Congress intended to create the private right of action plaintiffs seek to bring in federal court; even were [the Court] satisfied that some of the *Cort* factors supported implying such a right, [the Court] could not do so if unconvinced that Congress intended such a remedy." *Rogers v. Frito-Lay,* 611 F.2d 1074, 1078 (5th Cir. 1980). In this instance, the Court remains unconvinced that Congress intended a private remedy and at least two of the four *Cort* factors fail the plaintiffs. The plaintiffs cite only two court decisions which arguably support their position, but both cases are distinguishable and neither considered the question of a private right of action.[22] Hence, this Court concludes that there exists no private right of action of the nature sought by the plaintiffs under the Federal Power Act.

## C. *The Natural Gas Act*

The Cities argue that FPL has violated the Natural Gas Act by (1) conspiring to deprive the Cities of natural gas unlawfully, or (2) knowingly benefiting from the

**21.** Neither side has argued in any depth the fourth *Cort* factor—that the cause of action is not a traditional concern of the states. While utility rate-making is a traditional concern of the states, rate-making for interstate sales of power is traditionally a concern of the national government. Moreover, the enforcement of federal regulatory orders is a federal concern. Clearly, however, the mere fact that an area is of federal concern does not establish a federal cause of action beyond the administrative remedies available.

**22.** Plaintiffs cite *City of Cleveland v. Cleveland Elec. Ill. Co.,* 570 F.2d 123 (6th Cir. 1978), and *California v. Oroville-Wyandotte Irrigation Dist.,* 411 F.Supp. 361 (E.D.Cal.1975). In *Cleveland* the "sole issue" in the appeal was whether the electric company's counterclaims under the Federal Power Act were compulsory counterclaims giving the federal court jurisdiction under Fed.R.Civ.P. 13(a). 570 F.2d at 124. Having focused on the jurisdictional issue exclusively, the court did not discuss the issue of whether a private cause of action for damages existed under the act. Moreover, the F.P.C. orders upon which the electric company relied had been reduced to a contract between the parties, 570 F.2d at 125, and therefore there

was no need for the appeals court to decide the private cause of action question since there was a contract action available for non-payment of various fees. *Cleveland* is of no assistance to the plaintiffs.

In *Oroville-Wyandotte* one California state agency (DWR) sought declaratory and injunctive relief against a second state agency (OWID), contending that a California Public Utility Commission order requiring DWR to pay for a tunnel conflicted with a Federal Power Commission order that OWID construct the tunnel. The district court assumed jurisdiction of the case but decided that there existed no conflict and granted declaratory judgment for the defendant. The district court's memorandum indicates that neither party raised the private right of action issue, 411 F.Supp. at 366–67, and the court reached the "central issue" of the case; the alleged conflict between state and federal regulation, in order to "cut through the convoluted history of this case and the maze of motions herein." Thus the district court memorandum and its summary affirmance by the court of appeals, 536 F.2d 304 (9th Cir. 1976), is of little persuasive value on the question of a private right of action.

unlawful deprivation of natural gas to the Cities. The alleged violation is an attenuated one and therein lies one of the troubles the Cities face in seeking to assert it. In addition, the Court concludes that there exists no private right of action under the Natural Gas Act to remedy the alleged conduct of FPL.

The somewhat complicated violation alleged by the Cities can be simplified as follows: Various plaintiffs had contracts with Florida Gas Transmission Company (FGT) in which FGT was to supply these Cities with natural gas. In turn, FGT had a warranty contract with Amoco Production Company (Amoco) in which Amoco would supply FGT's needs. This latter contract was subject to the Natural Gas Act and had been certificated by the FPC. *Pan American Petroleum Corp.*, 34 F.P.C. 852 (1965). Because of the certification, the obligations under the contract could not be altered without Commission approval. *Gulf Oil Corp. v. FPC*, 563 F.2d 588 (3d Cir. 1977). At this time, Amoco also had a warranty contract directly with FPL. A separate 1967 agreement between Amoco and FGT varied the obligation between Amoco and FGT.[23] The separate 1967 agreement between Amoco and FGT was never filed with the Commission.

The Cities contend that the failure to file the 1967 Amoco-FGT agreement violated Sections 4, 5, and 7 of the Natural Gas Act, 15 U.S.C. §§ 717c, 717d & 717f. More im-

portant, the Cities allege that because of the 1967 agreement, the gas received by FGT was curtailed in the 1970's while the gas received by FPL was not curtailed. In falling short of its original warranty obligations to FGT, the Cities argue that Amoco violated the Natural Gas Act. *See Gulf Oil Corp. v. FPC*, 563 F.2d 588 (3d Cir. 1977). In particular, the Cities direct the Court's attention to the Commission's decision to investigate these circumstances further. *See Florida Gas Transmission Co.*, F.E.R.C. No. CP74–192 (August 21, 1978) (Order Rejecting Settlement and Directing Office of Enforcement to Institute Investigation). It is obvious, however, that a decision to investigate these circumstances does not amount to a finding that a violation was committed by FGT or Amoco, let alone FPL.

Even accepting these allegations as true, the Cities have sued neither FGT nor Amoco. Instead, they allege that FPL has somehow also violated the Natural Gas Act, arguing that either FPL conspired to bring about these violations of the Act or that it knowingly benefited from these violations.

The Cities concede that the agreement under which FPL obtained gas from Amoco was beyond the purview of the Act. Therefore, it cannot provide the sole basis for a violation of the Act by FPL. All of the provisions of the Act which FPL has allegedly violated specify the duties of *natural gas companies* in matters covered by the Act.[24] Not being a party to the agreements

---

**23.** The separate 1967 Amoco-FGT agreement permitted supplies of gas by Amoco beyond those minimum daily amounts required by the original agreement to be "banked" to balance against later possible underdeliveries. *See Florida Gas Transmission Co.*, FERC Case No. CP74–192, at 13 n. 26 (August 21, 1978) (Order Rejecting Settlement and Directing Office of Enforcement to Institute Investigation). The FERC staff argued that as a result of this banking agreement both FGT and Amoco violated the Natural Gas Act. *Id.* nn. 27 & 28. FPL has been included in the investigation ordered by the Commission, but the precise theory under which it could be held to have violated the Act is unclear. *See Florida Gas Transmission Co.*, 43 Fed.Reg. 38456 (Aug. 21, 1978). Apparently, the Cities contend that FPL conspired with Amoco or FGT or induced them to alter their

agreement in order to protect its warranty contract at the expense of the FGT warranty contract.

**24.** *See generally* Sections 4, 5, and 7 of the Natural Gas Act, codified at 15 U.S.C. §§ 717c, 717d & 717f. For instance, Section 4(d) provides:

Unless the Commission otherwise orders, no change shall be made *by any natural-gas company* in any such rate, charge, classification, or service. . . .

15 U.S.C. § 717c(d) (emphasis added). In another example, Section 7(b) provides:

No *natural-gas company* shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities . . .

15 U.S.C. § 717f(b) (emphasis added).

between Amoco and FGT or FGT and the Cities, FPL was not a natural gas company with respect to those agreements and could not have duties under the Act with respect to those agreements.[25]

An argument might be made that the duties under Sections 4, 5, and 7 of the Act are extended to other individuals and corporations by virtue of Section 21(a) of the Act, 15 U.S.C. § 717t(a), which provides:

(a) Any person who willfully and knowingly does or causes or suffers to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or who willfully and knowingly omits or fails to do any act, matter, or thing in this chapter required to be done, or willfully and knowingly causes or suffers such omission or failure, shall, upon conviction thereof, be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both.

Arguably, this criminal provision applies not only to those individuals and corporations who have duties under the Act but also other individuals and corporations who have no duties of their own and merely "cause" or "suffer" individuals or corporations with duties under the Act to violate those duties. Neither party in this action has argued this position and thus the Court does not consider the effect of Section 21(a). However, in the event that FPL does have any duties with respect to the agreements among Amoco, FGT, and the Cities, the Court concludes that there exists no implied rights of action to enforce those rights.

Normally, the inference *vel non* of a private right of action requires an extensive analysis similar to that made above with respect to the Federal Power Act. The Court has conducted such an analysis. However, because of the unusual similarity between the Natural Gas Act and the Federal Power Act, to set out that complete analysis here would be redundant to a great extent. Thus, the Court simply highlights very briefly the independent legislative history of the Natural Gas Act and two conflicting circuit court cases on point.

### 1 Legislative History

The Natural Gas Act was originally a part of the Public Utility Act of 1935 which amended the Federal Power Act and it was intended to operate similar to the Federal Power Act. See 81 Cong.Rec. 6724 & 6726 (1937) (Comments of Reps. Cole & Kenney, respectively). For some reason the provisions which became the Natural Gas Act were separated from the 1935 legislation and did not reach the full Congress until two years later. The bill, which was passed by the House in 1937 and the Senate in 1938, did not occasion much debate and there was no significant opposition to the bill.[26] It is clear that the Natural Gas Act was patterned after the Federal Power Act to regulate interstate sales of natural gas for resale much the same as the latter act regulates interstate sales of power.[27] Moreover, repeatedly in the brief Congressional debates, the Congressmen were told that the Natural Gas Act merely contained the standard provisions which had been incorporated into other regulatory legislation, including the Federal Power Act.[28]

---

**25.** Certainly, the repeated use of the phrase "natural-gas company" was meant to limit the reach of both the Act and the Commission. For example, during the House debate on the Act, an amendment was offered and accepted which added the phrase "by a natural-gas company" to Section 5(b) of the Act to restrict the reach of that provision. 81 Cong.Rec. 6728 (1937).

**26.** It was observed during the House debate that no group opposed the bill. *See, e. g.* 81 Cong.Rec. 6726 (1937) (remarks of Rep. Kenney). *See also* 81 Cong.Rec. 9312–17 (1937)

(Senate debate); 82 Cong.Rec. 8343–47 (1938) (Senate reading and passage).

**27.** One need only compare the relevant committee reports on the Federal Power Act and the Natural Gas Act to witness the similar purpose, structure, and provisions of the two Acts. *Compare* S.Rep.No.621, 74th Cong., 1st Sess. (1935) *with* H.Rep.No.709, 75th Cong., 1st Sess. (1937).

**28.** *See, e. g.,* H.Rep.No.709, 75th Cong., 1st Sess. 3 (1937) ("The bill provides for regulation along recognized and more or less standardized lines"); 81 Cong.Rec. 6721 & 6722 (1937) (re-

Nothing in the legislative history of the Natural Gas Act indicates that Congress intended to grant any implied private rights of action therein. On the contrary, the legislative history shows that Congress intended to establish a fairly common rate-making and regulatory scheme for interstate sales of natural gas similar to the Federal Power Act.

### 2. Judicial Decisions

One significant distinction between the Federal Power Act and the Natural Gas Act is that the latter has been the subject of two recent judicial decisions on the private right of action issue. The precise issue of implied private rights of action under the Natural Gas Act has not been decided by the Supreme Court although, of course, the decision in *Montana-Dakota* can give some guidance from its interpretation of the Federal Power Act. Two circuit courts of appeal have focused on the private right of action question and have reached incompatible results.

In *Farmland Industries, Inc. v. Kansas-Nebraska Natural Gas Co.*, 486 F.2d 315 (8th Cir. 1973), Farmland sued Kansas-Nebraska for damages arising from the latter's termination of gas delivery to Farmland. To this extent the district court and the appeals court inferred a private right of action. The implied private right of action analysis used by the Eighth Circuit antedated both *Cort* and the recent cases requiring a more stringent approach. The Eighth Circuit panel relied primarily on the now rejected approach in *Borak:*

> Kansas-Nebraska was under a continuing duty to deliver gas until it could justify an abandonment to the Commis-

sion, even though its contract obligation had expired. *See Sunray Mid-Continent Oil Co. v. FPC*, 364 U.S. 137, 155, 80 S.Ct. 1392, 1402, 4 L.Ed.2d 1623 (1960). Where there exists a federal right, there must be a concurrent federal remedy. 349 F.Supp. 670 at 677 et seq.; *see generally J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Kansas-Nebraska abandoned its boiler gas service to Farmland without the approval of the Federal Power Commission and must, therefore, be liable in damages to its customers.

486 F.2d at 317. Although the district court in *Farmland* employed a more complete analysis, *see* 349 F.Supp. 670, 677–81 (D.Neb.1972), its decision similarly antedated recent developments in this area of the law. Hence, the *Farmland* case is of little persuasive value.

In *Clark v. Gulf Oil Corp.*, 570 F.2d 1138 (3d Cir. 1977) the same Third Circuit panel which upheld the specific substantive right the Cities seek to extend, *see Gulf Oil Corp. v. F. P. C.*, 563 F.2d 588 (3d Cir. 1977), refused to infer a private right of action to do so. In *Clark*, a retail distributor and a plaintiff representing a class of ultimate consumers of natural gas sought damages for underdeliveries of natural gas by Gulf. After an exhaustive analysis of the *Cort* factors, the Third Circuit panel concluded that no private right of action should be inferred because such a remedy would be inconsistent with the comprehensive regulatory scheme established by Congress.

This Court concludes that the well-reasoned analysis of *Clark* is persuasive on the *Cort* factors. Fifth Circuit precedent is not to the contrary.[29] Indeed, the *Clark* analy-

---

marks of Rep. Lea) (The bill is "standardized legislation" with the "usual provisions"); *id.* at 6723 (remarks of Rep. Halleck) ("ample precedent for this sort of legislation" including the regulation of the interstate transportation and sale of electrical energy); *id.* at 6725 (remarks of Rep. Mapes) ("the provisions of the bill are largely the standardized provisions contained in most regulatory acts"); *id.* at 9312–17 (Senate) (remarks of Sen. Wheeler) (*semble*); 82 Cong.Rec. at 8347 (1938) (Sen. O'Mahoney:

"This bill is not of a controversial nature, is it?" Sen. Bulkley: "No.")

**29.** The plaintiff cited two cases as demonstrating that the Fifth Circuit recognizes an implied private right of action under the Natural Gas Act. In *Socony Mobil Oil Co. v. Brooklyn Union Gas Co.*, 299 F.2d 692 (5th Cir. 1962), aff'g *Brooklyn Union Gas Co. v. Transcontinental Gas Pipe Line Corp.*, 201 F.Supp. 673 (S.D.Tex. 1960) and *id.*; D.C. 201 F.Supp. 679, the Fifth Circuit affirmed a recovery for over-payment of

sis is particularly persuasive where, as here, the plaintiff seeks to extend liability to a litigant which was *not* a party to the agreement covered by the Act. At this very time the Commission staff is apparently conducting its own investigation of whether FPL violated the Natural Gas Act under the circumstances as alleged here. *See Florida Gas Transmission Co.*, FERC No. CP74–192 (Aug. 21, 1978). This Court could think of no measure which would more hamper the uniform development and enforcement of the law under the Natural Gas Act than to infer a private right of action on specula-

tively unlawful conduct such as that alleged in this complaint. For these reasons the Court concludes that there exists no private cause of action of the nature sought by the plaintiffs under the Natural Gas Act.

### III. *FPL Motion to Dismiss: Claims Under the Clayton and Robinson-Patman Acts*

The Cities allege that FPL's sales practices for electricity violated Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, and Section 3 of the Clayton Act, 15 U.S.C. § 14.[30] FPL

natural gas charges in excess of a rate determined by the Commission. Nowhere in the Circuit Court opinion nor in the District Court opinions is there a discussion of the private right of action issue. Primarily of concern in *Brooklyn Union* was the effect of a unique series of circumstances: On June 7, 1954 the Supreme Court held that sales by independent gas producers were covered by the Act and the Commission later determined that the contract rates in effect on June 7 were to be the lawful rates under the Act until rate changes were requested. Socony and other companies appealed the Commission decision and a stay of the Commission decision was granted by the Fifth Circuit. The stay was later dissolved and the purchasers of the natural gas sought recovery of the overcharges they had paid in the interim. Much of the judicial discussion turned on the effect of the Fifth Circuit stay. If the *Brooklyn Union* decisions are to be understood as authority for an implied right of action, they certainly must be limited to the rather unusual facts of that case and understood as an instance in which the private action is ancillary to the Commission's power to order a return of unjustified rate increases under Section 4(e), 17 U.S.C. § 717c(e). Such is not the case here.

In *Tenneco Oil Co. v. FERC*, 580 F.2d 722 (5th Cir. 1978) the Fifth Circuit declined to reach the merits of an appeal from a district court decision until the panel had the benefit of a Commission ruling on whether the disputed agreements were covered by the Act. The district court had dismissed a declaratory judgment action, deciding that the litigated agreements were not covered by the Act. The Cities argue that (1) the district court would not have reached the merits of the case if there existed no suitable private right of action, and (2) the court of appeals would have affirmed without waiting for a Commission decision if there existed no suitable private right of action. Unfortunately, the *Tenneco* case is too slender a reed to support the Cities' claimed private right of action. First, the only possible private right of action involved in that case was for declaratory

relief. Second, the two-page Fifth Circuit order decided nothing more than that a decision on the appeal must await a Commission determination. Finally, the lower court memorandum does not indicate whether the private right of action issue was ever raised at the trial court. Even had the private right of action question been raised, a finding that there existed no private right of action would have been compatible with the district court's conclusions as an alternate ground for the dismissal.

30. In pertinent part, Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, provides:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them; *Provided*, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . .

15 U.S.C. § 13. In pertinent part, Section 3 of the Clayton Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether

has moved to dismiss these portions of the complaint on the grounds that electricity is not a "commodity" within the meaning of the Clayton and Robinson-Patman Acts and therefore sales of electricity are beyond the reach of these Acts.

The Cities' complaint also alleges that FPL's practices with respect to the transmission of electricity violated the Clayton and Robinson-Patman Acts. However, the Cities now concede that transmission services are not commodities within the meaning of the Acts [31] and thus these claims are dismissed.

The pertinent provisions of the Robinson-Patman and Clayton Acts prohibit price discrimination and other anticompetitive practices dealing with "commodities" and "goods, wares, merchandise, machinery, supplies, or other commodities. Unfortunately, nowhere in the Acts did Congress define the term "commodities". This definitional lapse has required the courts to attempt to divine Congressional intent in a scattering of cases which have discussed this issue. Recently the district court in Delaware held that electricity was not a commodity under the Robinson-Patman Act. *See City of Newark v. Delmarva Power & Light Co.*, 467 F.Supp. 763, 772–74 (D.Del.1979). For reasons outlined below, this Court disagrees with the reasoning and result of the *Newark* district court and concludes that electricity is a commodity under the Acts.

When the Clayton Act was enacted in 1914, both Sections 2 and 3 were restricted to commodities and logic dictates that the word be interpreted similarly in both contexts. *See Baum v. Investors Diversified Services, Inc.*, 409 F.2d 872, 875 (7th Cir. 1969). As a general matter, Section 2 prohibits price discrimination by sellers of com-

modities and Section 3 prohibits sales of commodities on the condition that the buyer cease dealing with the seller's competitors.

Congress enacted the Clayton Act in the belief that judicial enforcement of the Sherman Act was inadequate to curb the anticompetitive actions of American business. *See generally*, P. Areeda & D. Turner, 2 *Antitrust Law* ¶ 303 (1978). The report of the Senate committee which considered the bill that became the Clayton Act stated:

> [T]he bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the [Sherman Act] . . . or other existing antitrust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation.

S.Rep.No.698, 63d Cong., 2d Sess. 1 (1914). As originally enacted, Section 2—the price discrimination provision of the Clayton Act—was intended to prevent injury to the *seller's* competitors, or what has come to be called primary line injury. *See* P. Areeda, *Antitrust Analysis* ¶ 702 (2d ed. 1974). The House committee noted that some businesses cut their prices in localities in which they had competitors but not elsewhere, which could have the effect of driving their competitors out of business. *See* H.Rep.No.627, 63d Cong., 2d Sess. 8 (1914). Similarly, it was thought that sales of commodities on the condition that the buyer not deal with the seller's competitors also undercut competition by sellers.

As amended in 1936 by the Robinson-Patman Act, Section 2 was broadened to combat the anticompetitive effects of price discrimination among the *buyers* of commodi-

---

patented or unpatented, for use, consumption, or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or

seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.
15 U.S.C. § 14.

**31.** Plaintiffs' Memorandum at 21.

ties, or secondary line injury. *See generally*, P. Areeda *supra* ¶ 713. Large chain stores and mail order houses had been able to use the size of their purchases to obtain discounts on the commodities they bought from manufacturers or wholesalers and, in turn, were able to undercut the resale prices of independent retailers. By prohibiting price differentials which could not be cost justified, the amendments to Section 2 were designed to eliminate the anticompetitive price discriminations encouraged by abuses in the manufacturer-wholesaler-retailer system of marketing.

In determining the meaning of "commodity" as Congress used that term, this Court observes that both the Clayton and Robinson-Patman Acts are to be construed broadly, given their remedial purposes. *See, e. g., Abbott Laboratories v. Portland Retail Druggists*, 425 U.S. 1, 11–12, 96 S.Ct. 1305, 1313, 47 L.Ed.2d 537 (1976) (and cases cited therein); *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968) (interpreting the term "customer" in Section 2(d) broadly to effectuate Congressional intent). Moreover, even though Congress may have focused its attention on the predatory purchasing practices of chain stores, the Robinson-Patman Act is not to be confined rigidly to that set of circumstances alone. *See FTC v. Sun Oil Co.*, 371 U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963).

The Supreme Court has never had the occasion to interpret the term commodity in reference to the Clayton and Robinson-Patman Acts. The several lower court cases construing that term have established several related tests for determining what constitutes a commodity. In particular, the Fifth Circuit has distinguished commodities from intangibles, the latter including services, rights, and privileges:

Legislative history and subsequent congressional studies clearly indicate that section 2(a) of the Act was intended to encompass only tangible articles of commerce [citations omitted]. In 1957, the Chairman of the House Judiciary Committee unsuccessfully sought to amend the Act to define 'commodities' as including 'services rendered by independent contractors.' [citations omitted]

Representative Patman, co-author of the Act, has stated, 'in its broadest sense, the word "commodity" might possibly include items of trade other than those in tangible form—for example, advertising, insurance, brokerage services, and similar items. However, the word is ordinarily used in the commercial sense to designate any movable or tangible thing that is produced or used as the subject of barter. This is the definition for the word "commodity" used in the Robinson-Patman Act.' Patman, Complete Guide to the Robinson-Patman Act 33 (1963). *Tri-State Broadcasting Co. v. United Press International, Inc.*, 369 F.2d 268, 270 n.2 (5th Cir. 1966). Where the alleged commodity involves both tangible and intangible elements, it is the dominant nature of the transaction which controls. *Id.* at 270; *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1191 (5th Cir. 1978).

The tangible-intangible distinction assists little in the case of electricity. The Cities point out that electricity, shocking as it may be, is tangible and that electrons can be weighed. Although the dominant purpose of purchasing electricity may not be to touch it, the dominant purpose would seem to be for its physical properties as opposed to any legal interests or personal services one acquires with its purchase. Yet this analysis is somewhat facile and incomplete.

Explicit in the Congressional passage of the Robinson-Patman Act and implicit in the tangible-intangible test is a concern with multi-level distribution systems of manufactured products. Congress was concerned that small retail businessmen would be forced out of business by larger retail chains or wholesaler-retailers which could obtain unjustified price advantages from manufacturers and wholesalers.

Electricity is a product manufactured from other forms of energy, whether physical (as in the case of hydroelectric power), chemical (as in power produced from burn-

ing fossil fuels), solar, or nuclear. As alleged in the complaint and accepted for the purposes of this motion, the distribution of electricity often involves multi-level sales from supplier to retailer. These characteristics of the manufacture and distribution of electricity track well the Congressional concern with possible discriminatory pricing in other manufactured products. Moreover, because of these very characteristics, the Court believes that a Fourth Circuit panel and, more recently, a single judge on the Fifth Circuit all assumed without discussion that electricity is a commodity or otherwise "goods, wares, merchandise, [or] supplies" within the reach of Section 3 of the Clayton Act. *See Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co.*, 184 F.2d 552, 559 (4th Cir. 1950); *Alabama Power Co. v. Alabama Electric Cooperative, Inc.*, 394 F.2d 672, 679–80 (5th Cir. 1968) (Godbold, J., dissenting).

Other forms of energy have been treated as within the scope of the Clayton and Robinson-Patman Acts even though they are not sold by department store chains or mail order houses. *See, e. g., Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (coal assumed to come within reach of Section 3 of Clayton Act, no violation found); *FTC v. Sun Oil Co.*, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963) (automobile gasoline within reach of Section 2 of Clayton Act, violation found); *United States v. Richfield Oil Corp.*, 99 F.Supp. 280 (S.D.Cal.1951) aff'd 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334 (1952) (*per curiam*) (automobile gasoline and other petroleum products covered by Section 3 of the Clayton Act, violation found); *B&W Gas Inc. v. General Gas Corp.*, 247 F.Supp. 339 (N.D.Ga.1965) (natural gas assumed covered by Sections 2 & 3 of Clayton Act, preliminary injunction denied). The Cities have also argued that Congress thought nuclear-generated elec-

tricity to be subject to the Clayton and Robinson-Patman Acts because Section 105(a) of the Atomic Energy Act, 42 U.S.C. § 2135(a), explicitly provides that nuclear licensees remain subject to various antitrust laws, including the pertinent provisions of these two Acts. The Court expresses no view on this interpretation of the Atomic Energy Act. However, it would certainly be anomalous if such forms of energy as coal, natural gas, and gasoline were commodities under the Clayton and Robinson-Patman Acts, but electricity were not. Certainly, Congress did not intend that one form of manufactured energy be exempt from these antitrust laws while others are not.

In *City of Newark v. Delmarva Power & Light Co.*, 467 F.Supp. 763, 772–74 (D.Del.1979), the district court took what this Court believes to be an unnecessarily narrow view of Congressional intent in using the word "commodity." [32] Moreover, the *Newark* court reasoned that Congress could not have intended to make electric power subject to the Robinson-Patman Act since it had a year earlier incorporated anti-discriminatory pricing provisions in the Federal Power Act. This argument is unpersuasive. First, the term "commodity" was used in the original Sections 2 and 3 of the Clayton Act in 1914, more than two decades before passage of either the Federal Power Act or the Robinson-Patman amendments to Section 2. If indicative of anything, the inclusion of anti-discriminatory pricing provisions in the later Federal Power Act demonstrates that Congress believed the electric power industry was an appropriate industry for the application of such antitrust provisions. Second, although the *Newark* court appeared to assume that review of price differentials by the Federal Power Commission (now the Federal Ener-

---

**32.** Quite correctly, the *Newark* court observed that the concern in the Robinson-Patman Act was about "price discrimination with respect to manufactured products and consumer goods." However, the *Newark* court never explains why electricity is not a manufactured product or a consumer good. Clearly, it is both. Rath-

er, the *Newark* court appears to have further restricted the term commodity to the department store or mail order house situation. This Court has already noted that the Robinson-Patman Act is not to be so narrowly construed. *See FTC v. Sun Oil Co.*, 371 U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963).

gy Regulatory Commission) would make a similar review by the courts under the Clayton and Robinson-Patman Acts inappropriate, such is not the case. Given the remedial nature of the antitrust laws and the long-standing reliance on private enforcement thereof, concurrent enforcement by both administrative agencies and courts is wholly appropriate. *See, e. g., Gulf States Utilities Co. v. FPC*, 411 U.S. 747, 760, 93 S.Ct. 1870, 1878, 36 L.Ed.2d 635 (1973) (Commission consideration of antitrust issues is an important "first line of defense against those competitive practices *that might later be the subject of antitrust proceedings*") (emphasis added).

For the above reasons, the Court concludes that electricity is a commodity within the terms of the Clayton and Robinson-Patman Acts. Hence, the motion of FPL to dismiss these portions of the complaint should be denied.

IV. *FPL Motion to Dismiss: Claims under Florida's "Little FTC Act"*

Among the several state antitrust claims against FPL asserted by the Cities are claims based upon Florida's "Little FTC Act" which declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade" to be unlawful. Fla.Stat. § 501.204. FPL has moved to dismiss the claims under the "Little FTC Act", contending that it is exempt from the Act under its terms. Fla.Stat. § 501.212 provides:

This part does not apply to:

(5) Any person or activity regulated under laws administered by . . . the Florida Public Service Commission

. . .

The Cities respond that the exemption in Section 501.212 is not applicable to the claims at bar because these claims arise from FPL's sale of wholesale power, an activity not regulated by the Florida Public Service Commission. *See* Fla.Stat. § 366.-11(1). However, this response by the Cities is incomplete. The exemption speaks not only in terms of an "activity" regulated by the Florida Public Service Commission, but

also in terms of "[a]ny person" so regulated. The issue is thus reduced to whether FPL is a "person" under the terms of the statute and, if so, whether all of its actions are therefore exempt from the "Little FTC Act" or simply those actions directly regulated by the Public Service Commission. FPL argues that it is wholly exempt while the Cities argue the exemption is limited to directly regulated activities.

Neither party has cited any state case law or administrative rulings which could assist the Court in resolving these questions. This Court has recently had occasion to wrestle with the task of interpreting the "Little FTC Act" in the absence of controlling state precedent. *See generally LJS Co. v. Marks*, 480 F.Supp. 241 (S.D.Fla. 1979). In such cases, the federal court must consider the option of abstention. In *LJS* this Court observed:

Where the question of state law is not difficult and can be settled from the language of the statute on its face, it would be an abuse of the court's discretion to force litigants who have not requested abstention to bear the burden of the additional costs of such a procedure.

480 F.Supp. at 243, n.3. In the instant case, however, the Cities and FPL argue equally plausible interpretations of the same statutory language without presenting the Court with a principled basis for resolving the conflicting interpretations of the state statute. The questions of state law to be resolved are important and transcend the case at bar in that they will ultimately determine whether FPL and other utilities in the state are to be subjected to an additional layer of administrative regulation by the state department of legal affairs. Clearly, this issue is a policy question which would be better resolved by the state legislature or the state courts.

Abstention from deciding important issues of state law is discretionary, *Gibson v. Jackson*, 578 F.2d 1045, 1048 (5th Cir. 1978), and is "appropriate where there has been presented difficult questions of state law bearing on policy problems of substantial public import whose importance

transcends the result in the case then at bar." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Where, as here, the litigants are engaged in combat over an important state statute, each side brandishing its own plausible interpretation of that statute, and where the federal court has no principled basis for deciding which side should be the victor, an exercise of judicial discretion is the better part of judicial valor. *Cf.* W. Shakespeare, *King Henry IV, Part I,* V, 4, 1. 120. The Court concludes that the causes of action based on the "Little FTC Act," Fla.Stat. §§ 501.201–.213, should be dismissed without prejudice to initiate state court proceedings thereon.

After a careful consideration of the record, it is hereby

ORDERED AND ADJUDGED that the plaintiffs' motion to dismiss the defendant's counterclaim is granted without prejudice for the defendant to file an amended counterclaim within thirty (30) days of this Order. It is further

ORDERED AND ADJUDGED that the defendant's motion to dismiss portions of the complaint is granted with respect to claims arising under the Federal Power Act, the Natural Gas Act, and Florida's "Little FTC Act" without prejudice to raise the "Little FTC Act" claims in state court; with respect to claims over electricity transmission services arising under the Clayton Act, as amended, the defendant's motion is granted; with respect to claims over electricity sales policies arising under the Clayton Act, as amended, the defendant's motion is denied.